**STATE of Minnesota, Respondent,**

v.

**Solomon Ellis SHANNON, Appellant.**

**No. C0-97-203.**

Supreme Court of Minnesota.

Aug. 27, 1998.

---

**16.** *See Banda,* 1 F.3d at 356; *Varela,* 976 F.2d at 1358.

**17.** *Hodgson,* 540 N.W.2d at 517.

**18.** *See Brown v. State,* 449 N.W.2d 180, 183 (Minn.1989).

John M. Stuart, State Public Defender, Cathryn Middlebrook, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Michael O. Freeman, Hennepin County Atty.,

Gayle C. Hendley, Asst. County Atty., for respondent.

## OPINION

GARDEBRING, Justice.

Solomon Ellis Shannon appeals from a conviction for first-degree murder in the shooting death of Eric Davis, under Minn.Stat. § 609.185(1) (1996). After a jury trial, Shannon was found guilty and sentenced to life imprisonment. *See id.* On appeal, Shannon argues that the trial court committed reversible error by admitting evidence relating to his alleged involvement in a separate robbery and shooting. We reverse and remand for a new trial, concluding that the admission of the prior crime evidence was error and that the error was prejudicial.

The shooting for which Shannon was convicted occurred at about 11 p.m. on August 24, 1995, as the victim, 19–year–old Eric Davis, a developmentally disabled young man, was walking near his home in south Minneapolis. Davis, who lived with his older sister and her family, had been educated in special programs at the public schools until he turned 18, at which time he was enrolled in a program to learn independent living skills. He was working part-time as a janitor and had recently learned to ride the bus to and from work. He often took the bus to his girlfriend's house after work and visited with her until 11 p.m. or so, when he would walk home.

On the night of his death, Davis apparently encountered two other young men as he approached his home. His 11–year–old niece, Nakisha Parker, heard a gunshot and looked out an upstairs window of their home to see two young men chasing another young man down the street and shooting at him. As the man who was being chased reached the yard of Davis's home, he fell to the ground. Nakisha heard someone yell "Blood Fool" and saw one of the two men stand over the fallen man and shoot him, then run away. Davis died in his home after family members brought him inside. According to police ac-

counts from the night of the shooting, Nakisha indicated that she did not recognize either of the two assailants involved in the incident.

However, Nakisha's later identification of Shannon as the assailant was central to the state's case at trial. While she had been unable to identify anyone on the night of the shooting and could not identify Shannon from a photo lineup that occurred some six months after the shooting, she did identify him from a second photo lineup. A second man she identified at that time was determined by police not to be a suspect. At trial, Nakisha described both of the young men who had chased Davis as being black, one being lighter-skinned with a short box-cut fade haircut, and the other darker-skinned with braided hair, wearing reddish pants. She identified Shannon as the one who shot Davis while standing directly over him. In explaining why she had not identified Shannon or the second assailant from the earlier photo lineup, she stated she didn't want to or wasn't "in the mood."

Other evidence at trial came from Johnny Edwards, an admitted member of the Bloods street gang, who had volunteered information to the police on several unsolved cases involving the Bloods. He testified at trial that on the day after Davis was shot, he encountered Shannon and Milton Lewis, both members of the Bloods gang, and Shannon boasted about having killed a member of the Bogus Boyz street gang the previous day. In exchange for providing information and testifying in several trials, the state offered Edwards lenient treatment on a charge of aggravated robbery, released him without bail, and provided him with some $2,000.

There was also evidence at trial relating to casings from the .380 caliber shells that were recovered from the scene of the shooting; their presence at the crime scene suggested that a semiautomatic handgun had been used. The gun itself was never recovered.

During pretrial proceedings, the state gave notice of its intention to introduce evidence of Shannon's participation in an earlier crime, for purposes of establishing identity and common scheme or plan; the defense objected to the state's motion. Specifically, the

state sought to introduce information about Shannon's role in a robbery and shooting that had occurred on March 15, 1995, some five months before the Davis murder, within a few blocks of the Davis crime scene. On that date, Brock Webster, a member of the Vice Lords street gang, came into the area to sell some marijuana to an acquaintance. Although he knew that the neighborhood was claimed by the Bloods, he testified that he was not worried because usually the Vice Lords and the Bloods got along.

According to Webster's testimony, he drove to the acquaintance's home and waited in the car while his girlfriend took the drugs into the house. He was approached by two individuals, who greeted him and asked him if he had any marijuana. According to Webster, he looked down at the bag of marijuana and then remembered nothing further until he awoke in the hospital. He had been robbed of an unknown quantity of marijuana and $150, and shot several times, leaving him permanently disabled.

The police learned that a juvenile, A.C., was bragging about his participation in the Webster incident and questioned him. A.C. admitted snatching some marijuana from Webster and claimed that he then ran from the scene. He also named Shannon and Lewis as the assailants.

A.C. was not at the pretrial hearing because he was being held at a juvenile detention facility in Colorado under a plea agreement in the Webster incident. The state gave an offer of proof that A.C. would testify that he had stolen the marijuana from Webster while Shannon and Lewis held guns on the victim. According to the proffer, A.C. would testify that he snatched the marijuana and ran before the actual shooting.

Minneapolis Police Sergeant Bret Lindback, who had headed up the investigation of the Webster shooting, testified at the pretrial hearing that he had interviewed Shannon twice concerning the Webster incident and had also interviewed A.C. At the first interview, Shannon admitted to being present at the scene of the Webster shooting, but denied participating in the robbery or shooting.

Shannon said that he saw Lewis with the gun, knew that Webster was going to be robbed, and anticipated getting a share of the marijuana if the robbery went smoothly. Although Sergeant Lindback testified that Shannon "intimated" that he was a lookout, he could not find such a statement anywhere in his report, nor could he say whether Shannon had agreed to sign the statement. Lindback also testified that Webster had identified Lewis as the person who shot him, but that he never identified Shannon as an assailant.

In addition, Webster testified at the pretrial hearing. After relating what he could recall of the incident, he said that he remembered nothing that happened after he looked down at the bag of marijuana. He identified Lewis from a photo lineup as one of the men who was standing next to the car just before the shooting occurred. He also testified that he knew Shannon, but that he had not seen him at the crime scene.

Finally, Shannon testified at the pretrial hearing that on the day of the Webster incident, he was in the vicinity at the time, visiting an aunt who lived on the other side of the street. He did not know in advance that a robbery was planned, but had heard that the Tyson Mafia street gang was planning to "do" [1] Webster because of a dispute. He testified that when he saw someone pull a gun on Webster, he ran away, not wanting to "stand there and watch somebody get shot." After the testimony, the court declined to rule on the motion to introduce evidence of the Webster shooting until after the state had presented its case-in-chief.

At the conclusion of the state's case-in-chief, the court held a hearing to determine whether to allow the state to introduce evidence of the Webster incident. Webster testified at this second hearing, as did A.C. A.C.'s testimony was conflicting: he said both that he did see Shannon with a gun on the day of the Webster shooting and also that he did not see Shannon with a gun. The state then indicated that if the evidence of the Webster shooting incident was admitted, it would proceed without A.C.'s testimony.

1. A street term meaning "kill."

After the hearing, the trial court ruled that the evidence of Shannon's participation in the Webster shooting was proven by clear and convincing evidence and could be heard by the jury.

On appeal, Shannon argues that the trial court committed reversible error by admitting evidence that he participated in the robbery and shooting of Brock Webster. He argues that the evidence was erroneously admitted because it was not clear and convincing, was not relevant to the issues of identity and common scheme or plan,[2] and was prejudicial to the defendant. We agree that the trial court erred and that the error was prejudicial; therefore, we reverse.

"Evidentiary rulings generally rest within the trial court's discretion and will not be reversed absent a clear abuse of discretion." *State v. Grayson,* 546 N.W.2d 731, 736 (Minn.1996) (internal quotation omitted). A defendant claiming that the trial court erroneously admitted evidence bears the burden of showing both the error and the resulting prejudice. *See id.* "Evidentiary errors warrant reversal if there is any reasonable doubt the result would have been different had the evidence not been admitted." *Id.* (internal quotation omitted).

Evidence of another crime, wrong, or act is not admissible at trial to prove the character of a person in order to show that he acted in conformity therewith. Minn. R. Evid. 404(b). Such evidence of other crimes (often referred to in Minnesota as *Spreigl* evidence after *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965)) may be admissible for other purposes, however, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b). Such evidence should not be admitted "unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence." *Id.*

In determining whether such evidence concerning other crimes by the defendant is admissible, the trial court must determine (1) that the evidence is clear and convincing that the defendant participated in the other offense; (2) that the *Spreigl* evidence is relevant and material to the state's case; and (3) that the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice. *See State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991).

In addition, in order to safeguard against the improper use of other crimes evidence, this court established several other limitations on its admission in *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967). *Billstrom* prescribed the following general procedural rules for *Spreigl* evidence:

(a) Evidence of other crimes may not be received unless there has been notice to the defendant of the state's intention to introduce such evidence;

(b) At the time the evidence is offered, the prosecutor must specify the exception to the general exclusionary rule under which it is claimed to be admissible;

(c) If evidence of other crimes is received for purposes of identity rather than to show a common scheme or plan, there must nevertheless be some relationship in time, location, or modus operandi between the crime charged and the other offenses;

(d) In order to admit other crimes evidence, the trial court must conclude that the direct or circumstantial evidence of defendant's identity is otherwise weak or inadequate, and that the evidence is necessary to support the state's burden of proof. It should be excluded where it is merely cumulative and a subterfuge for impugning defendant's character or for indicating to the jury that he is a proper candidate for punishment;

---

**2.** At the pretrial hearing, the state sought to introduce evidence of the Webster robbery and shooting under the "identity" and "common plan or scheme" exceptions to the general rule barring admissibility of prior bad acts in criminal cases. *See* Minn. R. Evid. 404(b). The state now argues in its brief to this court that the Webster incident was also relevant on the issue of motive. However, the state does not explain how the Webster shooting provided evidence of the motive for the murder at issue in this case, other than to argue that both crimes were gang-related.

(e) Both when the evidence is received and in its final instructions, the court should admonish the jury that the testimony is received for the limited purpose of establishing identity. It is the court's duty to advise the jury in unequivocal language that the defendant is not being tried and may not be convicted for any offense other than that charged, warning them that to convict for other offenses may result in unjust double punishment.

See id. at 178–79, 149 N.W.2d at 284–85.[3] Finally, when it is unclear whether *Spreigl* evidence is admissible, the benefit of the doubt should be given to the defendant and the evidence should be excluded. *See State v. Johnson*, 568 N.W.2d 426, 433 (Minn.1997).

■ We first consider Shannon's claim that the evidence of his participation in the Webster incident was not clear and convincing, a threshold requirement for the admission of prior crimes evidence. The evidence of Shannon's participation in the Webster incident is as follows:

(1) When questioned by police, Shannon admitted to being present at the Webster crime;

(2) Webster testified that he saw Lewis standing by the car and pointing a gun at him. He did not remember the shooting itself, but testified at the pretrial hearing that he did not see Shannon standing by the car or pointing a gun;

(3) Officer Lindback testified that he interviewed five to 10 witnesses to the Webster incident and that "a few" of the witnesses placed Shannon at the scene. Lindback estimated that, depending on which witness you believed, there were

from 15 to 100 people on the block at the time. Officer Lindback did not name any of the witnesses other than A.C., and the state did not make an offer of proof of any additional testimony.

In addition, the state initially made an offer of proof that A.C. would identify Shannon as one of the two individuals who shot Webster. When A.C. was brought from the juvenile facility in Colorado to testify at the pretrial hearing, however, he recanted, denying that Shannon had a gun, and the state, in essence, withdrew his testimony. Thus, his testimony, certainly the strongest offered by the state, could not be considered in support of the state's request for admission of the Webster incident.

■ We have said that clear and convincing evidence is "more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Weber v. Anderson*, 269 N.W.2d 892, 895 (1978). It is met when the truth of the facts sought to be admitted is "highly probable." *Id.* While individuals might differ on the application of the "clear and convincing" standard to a particular set of facts, we are certain that the meager evidence offered by the state in this case does not make an inference of Shannon's participation in the Webster robbery and shooting "highly probable." Unlike other cases in which we have affirmed the trial court's admission of *Spreigl* evidence on the strength of a conviction, a victim's clear identification of the defendant as the assailant, or the defendant's own confession of participation in the incident, in this case the state has offered little evidence of Shannon's participation in the shooting and robbery.[4]

---

**3.** Shannon does not argue that the *Billstrom* procedural requirements were violated. It appears from the record in this case that the state gave adequate notice and that the proper cautionary language was included in the trial court's instructions to the jury.

**4.** While evidence of the defendant's involvement in a past crime is most often proved by a conviction, by no means is that always the case. In *State v. McAdoo*, the defendant appealed from a conviction for robbing a neighborhood grocery, arguing that the trial court erroneously admitted *Spreigl* evidence that was not clear and convincing. 330 N.W.2d 104, 106 (Minn.1983). The *Spreigl* evidence in that case consisted of testimo-

ny linking the defendant to the robbery of a cab driver the night before the charged robbery. The cab driver positively identified the defendant from a photographic lineup, but was unsure of the identification at trial because the defendant's hair length had changed. *Id.* The cab driver was still positive about the identification of the defendant's photograph, and on review this court held that the evidence connecting the defendant to the *Spreigl* case was clear and convincing, even though the state later dismissed the charges against the defendant relating to the robbery of the cab driver. *Id.* The facts of *McAdoo* stand in stark contrast to this case, where the victim

If all of the testimony presented by the state at the pretrial hearing is believed, the state has shown, at most, that Shannon was one of several people in the vicinity of the incident, something he himself has admitted. No clear evidence was presented to show that Shannon possessed a gun on the day in question. A.C., the only witness who apparently had asserted that Shannon participated in the robbery and shooting, recanted his statement and denied Shannon participated in the shooting of Webster. Furthermore, in direct contradiction to the state's theory, the victim testified, both at the pretrial hearing and in the presence of the jury, that while he recognized Lewis as one of the individuals standing next to his car on the driver's side talking to him, he did not see Shannon near the car. Thus, we conclude that Shannon's participation in the robbery and shooting of Webster was not shown by clear and convincing evidence and should not have been admitted.[5]

In addition to Shannon's claim that his participation in the Webster incident was not proven by clear and convincing evidence, he also argues that the evidence does not meet the test of relevance necessary for admission of other crimes evidence, and we agree. As noted earlier, where *Spreigl* evidence is offered for the purpose of establishing identity, there must be "some relationship in time, location, or modus operandi" between the charged crime and the other crime offered as evidence. *Billstrom*, 276 Minn. at 178, 149 N.W.2d at 284. "The reason for this is that the closer the relationship, the greater is the relevance or probative value of the evidence and the lesser is the likelihood that the evidence will be used for an improper purpose." *State v. Frisinger*, 484 N.W.2d 27, 31 (Minn. 1992).

█ While we have not required that the similarity rise to the nature of a signature crime, if the prior crime is simply of the same generic type as the charged offense, it ordinarily should be excluded. *See State v. Cogshell*, 538 N.W.2d 120, 123–24 (Minn. 1995). Here, the crimes are not even of the same generic type. The Webster incident appeared to be a drug-related robbery and shooting, and although there was police speculation that gang rivalry was involved, even the victim testified that he did not feel threatened because of his presence in another gang's territory, because the two gangs involved generally had no trouble between them. As to the instant crime, the only evidence of gang connection comes from remarks overheard by the victim's niece, and there was no indication of any robbery involved. At most, the similarities between the two crimes were that they occurred in roughly the same neighborhood within some five months of each other, that both were shootings, and that they involved handguns. These general characteristics are simply not enough to link them for purposes of the admission of other crimes evidence.

Thus, because the state was not able to link Shannon to the Webster robbery and shooting by clear and convincing evidence, and because the prior crime was not relevant to the current charge under our previous case law, admission of evidence relating to the Webster incident was in error.

█ However, our inquiry does not end with this conclusion. A determination that the trial court erred by admitting the *Spreigl* evidence does not automatically warrant reversal of a conviction. Therefore, we turn next to the question of whether this evidentiary error was prejudicial. A conviction will not be reversed so long as the error was harmless beyond a reasonable doubt. *See State v. Slowinski*, 450 N.W.2d 107, 113 n. 1 (Minn.1990). As we said recently in *State v. Juarez*, "[I]f the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable

could not say that Shannon was present at the scene of the crime.

5. The dissent correctly notes that the legislature has created a separate category of crimes committed for the benefit of a gang. *See* Minn.Stat. § 609.229 (1996). However, that statutory provision is as irrelevant to this case as is the

evidence of the Webster shooting. Shannon was not charged under that statute, nor were the defendants in the *Spreigl* incident. Furthermore, whatever else that statutory provision might do, it does not even purport to alter the rules of evidence and past precedents of this court with regard to the admissibility of *Spreigl* evidence.

doubt," 572 N.W.2d 286, 292 (Minn.1997) (quoting *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996)). In making this analysis, the court must determine not whether a jury would have convicted the defendant without the error, but "whether the error reasonably could have impacted [sic] upon the jury's decision." *Id.*

In the present case, the prosecution's case was admittedly weak. The victim's niece identified Shannon as the man who shot her uncle only after twice indicating her inability or unwillingness to do so. The only other evidence of the assailant's identity came from Johnny Edwards, whose credibility was tainted by his own gang involvement and the benefits he gained by testifying against Shannon.

In the face of the limitations in the state's direct case, we cannot conclude that the guilty verdict in this matter "was surely unattributable" to the erroneous admission of the other crimes evidence. Therefore, we reverse the conviction and remand the matter for a new trial.

Reversed and new trial granted.

GILBERT, Justice (dissenting).

I respectfully dissent. Our standard of review for this case requires that "evidentiary * * * rulings * * * will not be reversed absent a clear abuse of discretion." *State v. Grayson,* 546 N.W.2d 731, 736 (Minn.1996) (quoting *State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990)). In this case there was no abuse of discretion.[1] Further, as the majority states in its opinion, we have previously enunciated that "[a] defendant who claims that the trial court erred in admitting evidence bears the burden of showing the error and the resulting prejudice." *Id.* (citing *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994)). In the present case, I conclude that Shannon has not borne his burden

of proof and would affirm the conviction for first-degree murder.

Our general rule of exclusion is that "[e]vidence of another crime, wrong or act is not admissible to prove the character of a person in order to show action in conformity" with such crime or to show the defendant's propensity to commit crime. Minn. R. Evid. 404(b); *see also State v. Bolte,* 530 N.W.2d 191, 196 (Minn.1995). However, our case law has long established that so-called *Spreigl* evidence may be admitted if it is offered for a proper purpose, such as demonstrating a common scheme or plan by the defendant. *See State v. Elli,* 267 Minn. 185, 188, 125 N.W.2d 738, 740 (1964). In this case the evidence of the Webster incident was not admitted to show Shannon's bad character, or to prove his propensity to commit crime. Rather, evidence of the Webster incident was offered to demonstrate the common scheme or plan of gang dominance and enforcement in this particular neighborhood of south Minneapolis.

The evidence offered at the pretrial conference and the subsequent *in camera* hearing tended to establish that both the murder of Eric Davis and the shooting of Brock Webster were shootings committed by members of the Bloods street gang in furtherance of the common scheme of gang domination and enforcement over a particular territory. Shannon admitted being a member of the Bloods gang, and the territory in which Davis was murdered was considered Bloods territory. He further admitted to carrying a .357 revolver for protection at the time of the Davis murder. Officer Gerlicher testified that Shannon surmised, under questioning, that if Davis had been shot in the manner described, it was probably because he was wearing blue-colored clothing, the color worn by the rival Bogus Boyz gang, in territory claimed by the Bloods street gang, which wears red colors. Shannon admitted to being present at the scene of the Davis murder,

---

1. In particular, I note that the procedural safeguards adopted by this court in *State v. Billstrom* were carefully observed in this case. *See* 276 Minn. 174, 177–79, 149 N.W.2d 281, 283–85. The state gave timely notice of the evidence to be offered and stated the exception on which it relied, and the trial court judge gave proper cautionary instructions to the jury. As an additional precaution, the trial court declined to rule on the admissibility of the *Spreigl* evidence until the conclusion of the state's case in chief and after an *in camera* hearing out of the presence of the jury.

and to running away after the shooting began.

Similarly the Webster shooting, far from being an isolated and unrelated incident, was demonstrated by Officer Lindback's testimony to be a robbery committed by members of the Bloods gang against Webster, a member of the rival Vice Lords gang, attempting to sell drugs in a Bloods neighborhood. Not only did Shannon again admit to being present at the scene of the crime and again claimed to have run away after the shooting began, he also told Officer Lindback that he anticipated getting a share of the marijuana taken from Webster after the robbery.

Further, there is statutory support for viewing a variety of criminal acts, not as isolated events, but as part of a common plan or scheme of criminal activity in furtherance of a criminal gang. In response to the pervasive and violent nature of gang-related crime, the legislature in 1991 established a separate category of crimes committed for the benefit of a gang. Act of June 3, 1991, ch. 279, § 30, 1991 Minn. Laws 1282, 1298–99, *codified as amended at* Minn.Stat. § 609.229 (1996). Subdivision 2 increases sentences for defendants convicted of committing certain enumerated crimes "for the benefit of, at the direction of, or in association with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members." Minn.Stat. § 609.229, subd. 2.

The majority reaches its conclusion by viewing these two incidents as separate and distinct events, one a robbery and attempted murder and the other murder. However, both crimes had striking similarities. They involved the repeated shootings of young, defenseless, African–American males at point blank range with the same caliber pistols. They occurred in an area of south Minneapolis claimed by the Bloods as their territory. The acts committed related to the Bloods' effort to control their territory and to punish those who dared infringe upon that territory. I believe that the majority has substituted its own judgment for the judg-

ment of the trial court, which held two hearings and took the matter under advisement before concluding that the *Spreigl* incident was admissible for the proper purpose of showing Shannon's role in enforcing the Bloods' dominance in the neighborhood where the crimes occurred.

I conclude that the trial court did not abuse its discretion in concluding that Shannon's participation in the Webster incident was proven by clear and convincing evidence.[2] The trial court, who heard the evidence, was in the best position to evaluate the credibility of the state's evidence, the relevance of the evidence, whether the evidence was needed, and the evidence would not be used by the jury for an improper purpose. *See State v. Cogshell,* 538 N.W.2d 120, 124 (Minn.1995). Because Shannon has not met his burden of proof and the trial court did not abuse its discretion in this case, I would affirm.

PAGE, Justice (dissenting).

I join in the dissent of Justice GILBERT.

---

**2.** While it would be helpful for the appellate court on review if the court had made specific findings on the record, our case law does not require the court to do so and the court's failure to do so is not error.