**STATE of Minnesota, Respondent,**

v.

**Timothy Patrick CHAMBERS, Appellant.**

**No. C3–97–2298.**

Supreme Court of Minnesota.

March 4, 1999.

Michael C. Davis, St. Paul, for appellant.

Michael Hatch, State Attorney General, Thomas R. Ragatz, Assistant Attorney General, St. Paul, Jeffrey Thompson, Rice County Attorney, Faribault, for respondent.

## OPINION

GILBERT, Justice.

This case involves a first-degree murder conviction resulting from a motor vehicle collision in which a Rice County Sheriff's Deputy was killed. The appellant, Timothy Patrick Chambers, asserts that seven different trial court rulings were erroneous and prejudicial, challenges the mandatory sentence of life imprisonment without parole, and asserts that the evidence was insufficient to support the first-degree murder conviction. We affirm the conviction and sentence.

On May 3, 1996, 17–year–old Chambers walked to the Priordale Mall to fill out a job application. As he was leaving the mall at about 12:30 p.m., Chambers saw a red 1991 Lincoln Town Car in the parking lot with the keys inside. Chambers took the Lincoln, which the owner reported stolen shortly after 12:30 p.m.

Soon thereafter, Deputy Donald Buchan of the Scott County Sheriff's Department saw and stopped Chambers, who was driving the stolen Lincoln. However, as Deputy Buchan started to get out of his vehicle, Chambers ran the Lincoln into Deputy Buchan's squad car and drove away. Deputy Buchan began pursuing Chambers and for a brief period the two vehicles "bounc[ed] off of each other." Chambers was then able to pull ahead of the squad car and Deputy Buchan continued his pursuit.

Despite the fact that several different police departments assisted in the pursuit, Chambers continued to flee, running numerous red traffic lights and hitting a truck that had been stopped at an intersection. Chambers then proceeded south on I-35, repeatedly swerving into the median and between vehicles. Throughout much of the 30-mile pursuit, Chambers was traveling at speeds of 90 to 110 miles per hour.

Hearing about the pursuit on his police radio, Deputy John Liebenstein of the Rice County Sheriff's Department decided to set up a roadblock at the top of the Rice County Road 1 exit ramp, only 2 miles from his home. Deputy Liebenstein informed the dispatcher of his intent and placed his unmarked squad car at the top of the exit ramp, leaving a space of over 12 feet for other vehicles to go around the squad car.

Near the border of Rice and Dakota Counties, two semi-truck drivers attempted to slow Chambers, blocking both lanes of traffic while traveling under the posted speed limit. Chambers drove into the median and around the trucks. Upon getting in front of the trucks, Chambers quickly veered to the right and proceeded up the Rice County Road 1 exit ramp, where Deputy Liebenstein had just finished setting up the roadblock.

Witnesses watched the Lincoln accelerate up the ramp and saw Chambers looking straight ahead. At the top of the ramp, the Lincoln collided with Deputy Liebenstein's squad car. Despite the 12-foot space available for Chambers to steer around the squad car, the Lincoln hit the passenger's side of the squad car directly between the front and rear wheels. At the time of impact, Deputy Liebenstein was either seated in the squad car or standing outside of the squad car leaning into it. He was killed instantly and his body was found approximately 70 feet from the point of the impact.

The investigation revealed no attempts by Chambers to slow down, stop, or steer to avoid the collision. After the collision, the wheels of the Lincoln were locked into a straightforward position, and there was no evidence that the brake lights were on at the time of the crash. The Lincoln, traveling between 93 and 98 miles per hour at the time of impact, left no skid marks.

Chambers was charged with first-degree murder of a peace officer, Minn.Stat. § 609.185(4) (1998), second-degree felony murder, Minn.Stat. § 609.19, subd. 2(1) (1998), fleeing a police officer resulting in death, Minn.Stat. § 609.487, subd. 4(a) (1998), and theft of a motor vehicle, Minn. Stat. 609.52, subd. 2(17) (1998). Pursuant to Minn.Stat. § 260.115 (1998), Chambers was automatically certified to stand trial as an adult.

At trial, the state introduced testimony of an individual who had been incarcerated with Chambers in the Steele County jail following the collision. This individual testified that Chambers said "he would go through anything to get away on that day." He further testified that:

> [Chambers said he had seen] a car blocking the ramp as he got—[sic] he made a decision that he wasn't going to be stopped; he was going to go through that and continue, and he said "if the cop wanted to be a hero, he would die a hero." * * * * [H]e said that before the accident he made eye contact with the person in the car and the person reacted like this. [Witness indicates by putting his arms up in front of his face.] * * * * He thought that was quite funny. He was laughing about it as he told me.

The witness described Chambers as being "flip" and "bragging about" the death of the deputy.

Prior to trial, the trial court heard several motions, some of which resulted in rulings that Chambers now asserts were erroneous. Chambers moved to change venue due to substantial pre-trial publicity from newspapers, radio, television and electronic media. Chambers' concern was based on the overall news coverage, with special reference to seven stories and one editorial that appeared in the *Northfield News* and one article that appeared in the *Faribault Daily News*. All of these articles were published in 1996. There was also television coverage by the major metropolitan television stations at or about the time of the incident. Most of the reports were factual in nature, although some were

not completely accurate. The reports included incorrect statements that Chambers was a high school dropout with over 20 prior arrests and a statement that Deputy Liebenstein was seated inside his squad car at the time of the collision, a fact that was greatly disputed at trial. The trial court denied Chambers' change of venue motion but granted the defense leave to renew its motion following voir dire if the defense was not satisfied with the outcome of jury selection.

The jury selection commenced approximately 1 year after this incident. There were extensive written questions submitted to each juror as well as regular voir dire. The trial court called 115 jurors and excused 54 of them for cause. During voir dire, jurors were questioned extensively regarding their exposure to information about the case. Only one juror to whom the defense objected was seated as a juror and the defense did not renew its venue motion. Although Chambers fails to allege any actual prejudice, he now asserts that a presumption of prejudice exists and that the trial court abused its discretion in refusing to grant a change of venue.

At a two-day motion hearing, the trial court heard several additional motions. The defense made a motion in limine to be permitted to examine potential jurors regarding the mandatory sentence of life imprisonment without possibility of release for a first-degree murder conviction. The trial court denied this motion, reasoning that sentencing was the province of the court rather than the jury. Chambers claims that this denial impeded his right to an impartial jury and urges this court to adopt a new rule permitting examination of jurors regarding sentencing in first-degree murder cases.

The defense also objected to the trial court requiring Chambers to wear leg restraints when he appeared in court. The restraints were worn under his trousers and may have been undetected by the jury. The trial court denied the defense's motion to remove the restraints, citing concern regarding flight based on Chambers' past history of attempts to flee police. Chambers asserts that requiring him to appear before the jury in re-straints was unwarranted and thus entitles him to a new trial.

At the motion hearing, Chambers also sought permission to introduce at trial evidence of police pursuit policies, including policies of "various jurisdictions through which the police pursuit traveled," and evidence that Deputy Liebenstein failed to follow the Rice County Sheriff's Department's policies in setting up the roadblock. The defense asserted that this evidence was relevant to Chambers' intent to kill and to whether Deputy Liebenstein was engaged in the performance of official duties, both of which are elements of first-degree murder under Minn. Stat. § 609.185(4). The trial court excluded this evidence and Chambers now asserts that this exclusion was an abuse of the trial court's discretion.

At trial, and over the defense's objection, the court made an additional evidentiary ruling that Chambers now asserts was erroneous. The trial court allowed the state to introduce evidence of some of Chambers' prior bad acts under Minn. R. Evid. 404(b). This evidence was admitted through the testimony of two witnesses. Kyle Koch, a friend of Chambers, testified that in August or September of 1995, Chambers told him that if he were ever involved with police, "he would do anything he could to get away." Koch also testified that in October 1995, he was a passenger in a stolen vehicle driven by Chambers. When police attempted to stop the vehicle, Chambers drove the vehicle through a ditch and across a field at speeds of up to 100 miles per hour. Furthermore, Scott County Police Officer John Niemann testified that in October 1995, Chambers told him that "he still wasn't afraid of law enforcement" and that "if he ever became involved in a chase he would ram the police off the road to get away." Niemann also testified that following Chambers' apprehension for a January 1995 vehicle theft, Chambers stated that "he was not afraid of law enforcement and that he would take [an officer] out if he had to get away." The trial court allowed the testimony to show intent and absence of mistake or accident under Minn. R. Evid. 404(b). Chambers asserts that the

testimony was unfairly prejudicial and thus the trial court erred in its admission.

The defense requested that the court instruct the jury on the lesser-included offenses of third-degree murder, second-degree manslaughter, and criminal vehicular homicide. The trial court instructed the jury on each of the charged offenses and on the lesser-included offense of third-degree murder, but refused to instruct the jury on second-degree manslaughter and criminal vehicular homicide. The jury returned a verdict of guilty for each charged offense, but did not return a verdict on the lesser-included offense of third-degree murder. The defense now asserts that the failure to instruct on the two lesser-included offenses was prejudicial error.

Following a full trial that spanned nearly three weeks, the jury found Chambers guilty of first-degree murder of a peace officer engaged in official duties, second-degree felony murder, fleeing a peace officer resulting in death, and theft of a motor vehicle. The trial court sentenced Chambers under the first-degree murder conviction, which is classified as a heinous crime and carries a mandatory sentence of life imprisonment without possibility of release. Minn.Stat. § 609.184, subd. 2(1) (1996) (repealed and recodified at Minn. Stat. § 609.106, subd. 2(1) (1998)). In addition to his multiple assignments of error regarding the conviction, Chambers also challenges his sentence as cruel or unusual in violation of the United States and Minnesota Constitutions, and asserts that the trial court erred in refusing to exercise its equitable powers to sentence Chambers under the second-degree murder conviction instead of the first-degree murder conviction.

In total, Chambers now asserts nine separate assignments of error: (1) the trial court abused its discretion in denying the defense's motion for a change of venue; (2) the trial court abused its discretion by refusing to allow questioning of potential jurors regarding the mandatory sentence for a first-degree murder conviction; (3) the trial court abused its discretion in requiring Chambers to appear in leg restraints; (4) the trial court erred in refusing to allow evidence of police pursuit policies and of Deputy Liebenstein's lack of compliance with those policies; (5) the trial court abused its discretion in allowing the state to introduce evidence of Chambers' prior flight attempts and prior threats against police; (6) the state failed to present sufficient evidence to support the conviction for first-degree murder; (7) the trial court erred in refusing to instruct the jury on the lesser-included offenses of second-degree manslaughter and criminal vehicular homicide; (8) the trial court erred in sentencing Chambers to the mandatory sentence for the first-degree murder conviction rather than for the second-degree murder conviction; and (9) the mandatory sentence of life imprisonment without parole as applied to 17–year–old Chambers violates the constitutional prohibition of cruel or unusual punishment.

## I.

■ Prior to trial, Chambers moved the trial court for a change of venue based on newspaper and television reports of Deputy Liebenstein's death. Statewide media venues, and those in Rice County in particular, published factual reports and editorial comments concerning the incident. The trial court denied Chambers' motion, but granted him leave to renew the motion following voir dire if he were dissatisfied with the jury selection process. Chambers did not renew his motion yet now asserts that the trial court abused its discretion in denying the motion for the change of venue. Chambers does not allege, nor does the record contain any support of actual prejudice. Chambers instead alleges presumed prejudice because of the saturation of the trial venue with prejudicial and inflammatory publicity about the crime.

■ The decision to grant or deny a motion for a change of venue is within the wide discretion of the trial court. *State v. Salas*, 306 N.W.2d 832, 835 (Minn.1981). Before this court will reverse a conviction based on a denial of a change of venue motion, we must find not only that the trial court abused this wide discretion, but also that the denial resulted in prejudice to the defendant. *See State v. Everett*, 472 N.W.2d 864, 866 (Minn. 1991); *State v. Kinsky*, 348 N.W.2d 319, 323 (Minn.1984).

In the present case, the trial court exercised caution in entering the preliminary ruling denying the change of venue, and granted Chambers leave to renew his motion if unsatisfied with the outcome of the intensive voir dire process. "Where a defendant is granted leave to renew his motion for change of venue immediately before trial, but declines to do so, he waives 'any right he may have had to a change of venue.'" *State v. Brom*, 463 N.W.2d 758, 762 (Minn.1990) (quoting *State v. Knowlton*, 383 N.W.2d 665, 669 (Minn.1986)). In this case, the trial court had clearly granted Chambers leave to renew his motion for a change of venue. Chambers could have renewed his motion were he dissatisfied with the jury selection process. He failed to renew his motion and, in doing so, he waived any right he may have had to a change of venue.

## II.

Chambers next asserts that the trial court's refusal to allow voir dire examination of jurors regarding the mandatory sentence of life imprisonment without possibility of release for a first-degree murder conviction also deprived him of an impartial jury. Chambers further urges this court to adopt a new rule that would allow questioning of potential jurors regarding sentencing where a conviction will result in a mandatory sentence.

During voir dire, each party "may examine [potential jurors] in reference to qualifications to sit as a juror." Minn.Stat. § 546.10 (1998). The trial court has substantial discretion in conducting voir dire, and we will not overturn a trial court's decision absent an abuse of this discretion. *See State v. Logan*, 535 N.W.2d 320 (Minn.1995).

In advocating a new rule to allow examination of jurors regarding sentencing, Chambers cites to a line of United States Supreme Court cases allowing such examination in death penalty cases. However, these cases are simply not analogous. First, "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two."

*Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Further, in capital cases the jury frequently participates in choosing between a sentence of capital punishment or life imprisonment, thus making the jurors' feelings about capital punishment relevant to their ability to be fair and impartial. *See, e.g., Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (reversing sentence, but not conviction, where jury was improperly questioned regarding capital punishment). In this case, the jury had no role in selecting the sentence, which was statutorily mandated. *See* Minn.Stat. § 609.184, subd. 2(1).

It has long been the rule in Minnesota that sentencing is not a proper consideration for the jury. *See State v. Gensmer*, 235 Minn. 72, 80–81, 51 N.W.2d 680, 685 (1951); *State v. Finley*, 214 Minn. 228, 231–32, 8 N.W.2d 217, 218 (1943) ("The jury go outside their province as triers of the facts if they include the matter of punishment in their deliberation."). Sentencing is an exercise of the court rather than the jury, and "[i]t is proper in a criminal case to admonish the jury that the punishment is a subject with which they have nothing to do." *Gensmer*, 235 Minn. at 79, 51 N.W.2d at 685. The jury's role is to determine whether the state has met its burden of proving the elements of the crimes charged beyond a reasonable doubt. In this case, the trial court did not abuse its discretion by refusing to allow examination of jurors on an issue unrelated to their qualifications or responsibilities. We further decline to accept Chambers' invitation to overturn the longstanding rule prohibiting jurors from considering sentencing in favor of a new and unprecedented rule that would allow examination of potential jurors regarding sentencing.

## III.

Chambers also asserts that the trial court abused its discretion by requiring him to wear a leg brace restraint when he appeared in court before the jury. The brace was worn under Chambers' trousers and Chambers' counsel acknowledged that the brace was likely undetected by the jury.

■ The decision to require a criminal defendant to wear restraints while in court is within the discretion of the trial court, and we will not overturn a trial court's decision absent an abuse of discretion. *State v. Shoen,* 578 N.W.2d 708, 713 (Minn.1998).

Minnesota Rule of Criminal Procedure 26.03, subd. 2(c) states:

> Defendants * * * shall not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order or security. A trial judge who orders such restraint, shall state the reasons on the record outside the presence of the jury. Whenever physical restraint of a defendant * * * occurs in the presence of jurors trying the case, the judge shall on request of the defendant instruct those jurors that such restraint is not to be considered in assessing the proof and determining guilt.

■ Requiring a defendant to appear in restraints is "an inherently prejudicial practice that is constitutionally permissible only when 'justified by an essential state interest specific to each trial.'" *Shoen,* 578 N.W.2d at 713 (quoting *Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). In determining whether restraint is justified, we look to the following factors: (1) the seriousness of the charge; (2) the defendant's temperament and character; (3) the defendant's age and physical attributes; (4) the defendant's past record; (5) the defendant's prior escapes or attempted escapes; (6) threats made by the defendant to cause a disturbance; (7) the size and mood of the audience; (8) the nature and security of the courtroom; and (9) any less restrictive available alternatives. *State v. Stewart,* 276 N.W.2d 51, 62, n. 5 (Minn.1979) (citing *State v. Tolley,* 290 N.C. 349, 226 S.E.2d 353, 368 (1976)). A trial court need not wait for a defendant to cause disruptions to require restraints; rather, the need for restraints may be inferred "from attributes of the defendant or his prior conduct." *Id.* at 62.

In this case, the trial court made an appropriate record of its finding of necessity for restraints, stating:

> I will allow the use of a leg brace, not because I'm concerned the defendant is going to be disruptive, * * * but I'm concerned of the issue of flight and he's a young man; as pointed out by the prosecution, in the past he has a history of flight and I recognize the defense points out that the flight occurred outside of a courtroom setting; no suggestion that he has attempted to flee while in a courtroom setting. However, I think we must be prudent in that the leg brace is inconspicuous. I'm going to allow it.

While Chambers made no threats to flee or disrupt the courtroom, several other *Stewart* factors were present in this case. Chambers was facing the very serious charge of first-degree murder. He had a history of fleeing police, and the incident with which he was charged arose out of a flight attempt. He was a young man in apparent good health. Further, the trial court ordered an inconspicuous and unobtrusive means of restraint that may have been undetected by the jury. The trial court had substantial objective reason to be concerned about the risk of a flight attempt. Thus, we cannot conclude that the trial court abused its discretion in requiring Chambers to wear restraints.

## IV.

■ At trial, Chambers sought to introduce evidence of pursuit policies of various police jurisdictions and evidence that Deputy Liebenstein was not following the Rice County Sheriff's Department policies at the time of the collision. The defense argued that this evidence was relevant to two of the elements of first-degree murder: Chambers' intent to kill and Deputy Liebenstein's engagement in official duties. *See* Minn.Stat. § 609.185(4). The trial court precluded the evidence as irrelevant. On appeal, Chambers asserts that this preclusion was an abuse of the trial court's broad discretion and impeded his ability to present a defense.

■ The trial court has broad discretion in ruling on evidentiary matters and we will not overturn a trial court's evidentiary rulings absent a clear abuse of this discretion. *See State v. Willis,* 559 N.W.2d 693, 698 (Minn.1997); *State v. Glaze,* 452 N.W.2d 655,

660 (Minn.1990). On appeal, Chambers must show both that the trial court abused its discretion and that this abuse resulted in prejudice. *See Willis,* 559 N.W.2d at 698.

While it is true that some jurisdictions require the peace officer victim to be acting lawfully in order for a first-degree murder of a peace officer conviction to stand, *see, e.g., People v. Gonzalez,* 51 Cal.3d 1179, 275 Cal. Rptr. 729, 800 P.2d 1159, 1176 (1990), that issue is not before us. Chambers does not allege that Deputy Liebenstein was acting unlawfully in the discharge of his official duty, but instead alleges that Deputy Liebenstein was not acting in substantial compliance with police department policies. Chambers thus urges this court to adopt a new rule requiring that the peace officer be acting in substantial compliance with police policies at the time of his death in order to be considered "engaged in official duties" under Minn. Stat. § 609.185(4). We decline to do so.

The record clearly supports the assertion that the deputy was engaged in the performance of official duties at the time of the collision. He was on duty, was driving an unmarked police vehicle, and was fully aware of the high-speed pursuit taking place. He specifically directed his efforts at assisting the other police officers in apprehending the individual being pursued. Official duty under Minn.Stat. § 609.185(4) is a broad concept and should be viewed in the context of the purpose of the statute. We have previously stated that:

> [T]he most evident rational basis for enacting the statute was to deter the killing of police officers.
>
> The legislature presumably sought to protect police officers, who are highly vulnerable when engaged in the performance of their duties, by making the slaying of a police officer a crime of first-degree murder punishable by life imprisonment.

*State v. Brown,* 345 N.W.2d 233, 239 (Minn. 1984).

The split-second decision making required of a police officer under these circumstances does not require perfect adherence to all policies and procedures. Furthermore, there is no evidence that prior to the collision Chambers knew what the police policy was

regarding exiting a vehicle upon setting up a roadblock. Chambers does not claim that he had any expectation that Deputy Liebenstein would have done anything other than remain in or near his vehicle at that road block. Accordingly, we find that the trial court did not abuse its discretion in precluding the evidence of police pursuit policies as irrelevant.

## V.

■ Chambers also challenges a second evidentiary ruling by the trial court. At trial, the state was allowed to introduce testimony regarding Chambers' October 1995 high-speed attempt to flee police during a vehicular theft and Chambers' prior statements that he would do whatever he had to do to get away from police and that he would not hesitate to "take [an officer] out" if necessary to escape arrest. The trial court ruled that this evidence was admissible to show that the collision was less likely to have been the result of mistake or accident. Chambers asserts that this ruling was an abuse of the trial court's discretion.

■ Minnesota Rule of Evidence 404(b) provides that evidence of other bad acts, also known as *Spreigl* evidence, *see State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), is admissible to prove intent or absence of mistake or accident. We have previously articulated three requirements that must be satisfied before *Spreigl* evidence is admissible. *See State v. Shannon,* 583 N.W.2d 579, 583 (Minn.1998). First, there must be clear and convincing evidence that the defendant committed the other bad act. *Id.* Second, the *Spreigl* evidence must be relevant and material to the state's case. Accordingly, without the *Spreigl* evidence the state's case must be "weak or inadequate," thus making the evidence "necessary to support the state's burden of proof." *Id.* Third, the probative value of the *Spreigl* evidence must not be outweighed by its potential for unfair prejudice. *Id.; see also* Minn. R. Evid. 403.

■ As with all evidentiary issues, we will not reverse a trial court's decision to admit *Spreigl* evidence absent a clear abuse

of discretion. *Shannon,* 583 N.W.2d at 583. The defendant has the burden of showing that the admission was both erroneous and prejudicial. *Id.*

In this case, Chambers does not dispute that there was clear and convincing evidence that he committed the prior bad acts or that evidence of those acts was material to the state's case. Chambers instead argues that his statements and prior flight attempt lacked relevance and that their probative value was outweighed by their potential for unfair prejudice.

▪ The trial court specifically ruled that the statements to the police officer were relevant to show absence of mistake or accident and to show Chambers' intent to kill and found that the state's evidence on both of these issues was weak without the additional testimony. In his brief, Chambers asserts that the admission of the statements was "unquestionably" prejudicial to the defense, because it "made Deputy Liebenstein visible before the collision," therefore proving intent to kill. Chambers is correct that this testimony supported the state's claim that Chambers intended to kill the deputy, but he errs in asserting that this alone makes the evidence unfairly prejudicial under *Spreigl.* Prejudice in this context " 'does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.' " *State v. Cermak,* 365 N.W.2d 243, 247, n. 2 (Minn.1985) (citation omitted). Thus, the prejudice referred to is not whether the evidence supports the state's case in a weak area, but whether the evidence encourages the jury to convict based on a prior crime rather than the charged crime. *See id.; State v. Bolte,* 530 N.W.2d 191, 197, n. 3 (Minn.1995).

In this case, we do not conclude that the jury would have been tempted to convict Chambers of first-degree murder merely to punish him for his prior attempt to flee. Therefore, this information was not unfairly prejudicial and the trial court was within its discretion in its admission.

▪ It is similarly unlikely that the jury would have convicted Chambers of first-degree murder merely because of Chambers' prior statements about police. These statements were "bad acts" rather than prior crimes. Where evidence sought to be introduced under *Spreigl* does not tend to show that the defendant is guilty of a crime other than the crime with which he is charged, "the chance of it creating unfair prejudice [is] less than is ordinarily the case when evidence is admitted under Rule 404(b)." *State v. Kutchara,* 350 N.W.2d 924, 926 (Minn.1984). While Chambers' prior statements certainly supported the state's burden of proof, because the statements did not tend to show that he was guilty of a crime other than the crime with which he was charged, the chance of unfair prejudice is slight. Thus, Chambers' prior statements were also not unfairly prejudicial and the trial court did not abuse its discretion in admitting the testimony.

## VI.

▪ Following the close of evidence, Chambers moved the trial court for acquittal on the first-degree murder charge, asserting that there was insufficient evidence to support a guilty verdict. The trial court denied Chambers' motion, and Chambers now asserts that his conviction for first-degree murder of a peace officer cannot stand because the state failed to produce sufficient evidence to support the jury's verdict.

▪ In reviewing a claim of insufficient evidence to support a verdict, we look to "whether, based on the facts established [by the record] and any legitimate inferences that can be drawn from them, a jury could reasonably find the defendant guilty of the offense." *State v. Merrill,* 428 N.W.2d 361, 366 (Minn.1988). We view the evidence in the light most favorable to the jury verdict, and assume that the jury believed all of the state's witnesses and disbelieved any evidence to the contrary. *Id.*

▪ A jury may properly find a defendant guilty of first-degree murder of a peace officer where the evidence shows beyond a reasonable doubt that the defendant "cause[d] the death of a peace officer * * *

with intent to effect the death of that person or another, while the peace officer * * * [was] engaged in the performance of official duties." Minn.Stat. 609.185(4). Chambers asserts that the evidence presented at trial was not sufficient to prove intent to kill.

Taken in the light most favorable to the verdict, the evidence produced at trial was as follows. Prior to the date of the collision, Chambers had previously fled police at high speeds, and had repeatedly made threatening statements directed toward police. These threats included statements that he would do whatever he had to do to get away from police, that he would "take [an officer] out" if he had to, and that he would "ram" an officer off the road to get away. On the date of the collision, Chambers stole a vehicle and drove recklessly at speeds of 90 to 110 miles per hour, hitting at least two vehicles during the pursuit. Deputy Liebenstein, who was on duty that day, parked his squad car at the top of an exit ramp in an attempt to slow or stop Chambers. Upon exiting the interstate, Chambers saw Deputy Liebenstein's car parked at the top of the ramp and made no attempt to stop or avoid the deputy's car. Chambers instead aimed for the deputy's car and accelerated, keeping the wheels in a straight-ahead position. Chambers made eye contact with the deputy and watched him attempt to protect his face. Chambers then collided squarely with the squad car at speeds of 93 to 98 miles per hour, killing the deputy.

We hold that, based on the facts established in the record and any legitimate inferences that can be drawn from them, a jury could reasonably have found Chambers guilty of first-degree murder of a peace officer, and thus the evidence was sufficient to support the guilty verdict.

## VII.

■ The trial court instructed the jury on each of the charged offenses and on third-degree murder as a lesser-included offense of first-degree murder, but refused to instruct the jury on the lesser-included offenses of second-degree manslaughter and criminal vehicular homicide. Chambers now asserts that the refusal to instruct on these two lesser-included offenses was an abuse of the trial court's discretion.

■ The decision to submit instructions for lesser-included offenses lies within the sound discretion of the trial court, "but where the evidence warrants an instruction, the trial court must give it." *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn.1986). We use a two-part test to determine whether the jury should have been instructed on a lesser-included offense: (1) whether the offense in question is an included offense; and (2) whether "a rational basis exists for the jury to convict appellant of the lesser offense and acquit him of the greater crime." *State v. Buntrock*, 560 N.W.2d 383, 386 (Minn.1997). Every lesser degree of homicide or murder is a lesser-included offense of first-degree murder, and thus the first element of the two-part test is satisfied for both of the requested lesser-included offenses. *See State v. Leinweber*, 303 Minn. 414, 228 N.W.2d 120 (1975).

Under the second part of this test, we must first determine whether the jury could rationally have convicted Chambers of either second-degree manslaughter or criminal vehicular homicide. Second-degree manslaughter is committed whenever a person causes the death of another "by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205(1) (1998). Criminal vehicular homicide is committed whenever a person "causes the death of a human being not constituting murder or manslaughter as a result of operating a motor vehicle * * * in a grossly negligent manner." Minn.Stat. § 609.21, subd. 1(1) (1998). These lesser-included offenses require a finding of either culpable or gross negligence. Culpable negligence has been defined as "intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." *State v. Beilke*, 267 Minn. 526, 534, 127 N.W.2d 516, 521 (1964). Gross negligence has been defined as "without even scant care but not with such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong."

*State v. Meany*, 262 Minn. 491, 496, 115 N.W.2d 247, 252 (1962).

The trial court, after hearing all of the evidence, determined that the facts of this case did not support a finding of negligence. This determination was supported by the record. As the chase escalated into the moments immediately preceding the collision, Chambers' level of intent exceeded gross or culpable negligence. We therefore hold that the trial court did not abuse its discretion in finding that the jury could not rationally have convicted Chambers of a crime requiring a finding of negligence.

Further, there is no rational basis for the jury to have acquitted Chambers of each of the charged offenses. Second-degree felony murder is committed whenever a person "causes the death of a human being, *without intent* to effect the death of any person, while committing or attempting to commit a felony offense * * * with force or violence." Minn.Stat. 609.19, subd. 2(1) (1998) (emphasis added). At trial, it was undisputed that Chambers struck and killed Deputy Liebenstein while committing the felony of theft of a motor vehicle. Minn.Stat. § 609.52, subd. 2(17) & subd. 3 (1998). Chambers' high-speed flight in a stolen vehicle, which resulted in several collisions prior to the final fatal collision, clearly evidences Chambers' use of force while committing a felony. Each of the elements of second-degree felony murder was satisfied and undisputed, and therefore the jury could not have rationally acquitted Chambers of second-degree felony murder. We hold that because the jury could have neither rationally convicted Chambers of second-degree manslaughter or criminal vehicular homicide nor rationally acquitted Chambers of second-degree felony murder, the trial court did not abuse its discretion in refusing to instruct the jury on the lesser-included offenses.

### VIII.

■ After the jury found Chambers guilty of each of the charged offenses, the trial court sentenced Chambers to the statutorily mandated sentence of life imprisonment without possibility of release for the first-degree murder offense. *See* § 609.184, subd. 2(1). Chambers now asserts that the trial court erred by refusing to exercise its equitable powers to stay imposition of Chambers' sentence for the first-degree murder conviction. Chambers asserts that the trial court should have instead sentenced him for the lesser crime of second-degree felony murder. However, Chambers lacks any legal ground on which to base this assertion.

Statutorily, the trial court lacked the discretion to stay imposition or execution of Chambers' sentence for the first-degree murder conviction. Minnesota Statute section 609.135, subd. 1(a) (1998), states, in part, *"[e]xcept when a sentence of life imprisonment is required by law, * * * any court may stay imposition or execution of sentence." Id.* (emphasis added). Further, Minn.Stat. § 609.184, subd. 2, states that the trial court *"shall* sentence a person to life imprisonment without possibility of release" following a conviction of first-degree murder of a peace officer. *Id.* (emphasis added). Thus, the trial court was statutorily prohibited from staying imposition or execution of a sentence for a conviction of first-degree murder of a peace officer. *See Bangert v. State,* 282 N.W.2d 540, 547 (Minn.1979). The trial court did not err in doing what the statute required.

### IX.

■ Chambers also asserts that the sentence of life imprisonment without possibility of release, as applied to him, violates the prohibition of cruel or unusual punishments of the Federal and Minnesota Constitutions. *See* U.S. Const. amend. VIII (prohibiting cruel and unusual punishment); Minn. Const. art. I, § 5 (prohibiting cruel or unusual punishment).

■ This court reviews constitutional challenges of statutes *de novo. See State v. Behl,* 564 N.W.2d 560, 566 (Minn.1997). Statutes are presumed constitutional, and a person challenging a sentence as cruel or unusual "bears the 'heavy burden' * * * of showing that our culture and laws emphatically and well nigh universally reject" the sentence. *Harris v. Wright,* 93 F.3d 581, 583 (9th Cir.1996) (quoting *Stanford v. Kentucky,*

492 U.S. 361, 369–73, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)); *see also State v. Merrill,* 450 N.W.2d 318, 321 (Minn.), *cert. denied,* 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990).

■ Cruel or unusual punishment analysis requires this court to focus on "the proportionality of the crime to the punishment." *State v. Mitchell,* 577 N.W.2d 481, 489 (Minn. 1998). Chambers does not dispute that a sentence of life imprisonment is proportionate to the heinous crime of first-degree murder of a peace officer.

■ However, in determining whether a sentence is cruel or unusual, we must also determine whether the "punishment comports with the 'evolving standards of decency that mark the progress of a maturing society.' " *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)); *see also Stanford,* 492 U.S. at 361, 109 S.Ct. 2969. In making this determination, we look to standards as expressed by the legislature, since it is the legislature that is " 'constituted to respond to the will and consequently the moral values of the people.' " *McCleskey v. Kemp,* 481 U.S. 279, 319, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting *Furman v. Georgia,* 408 U.S. 238, 383, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)); *see also McLaughlin v. State,* 291 Minn. 277, 284, 190 N.W.2d 867, 872 (1971).

■ It is of particular interest in this case that in 1993 the legislature amended Minn.Stat. § 609.184, subd. 2, to impose a mandatory sentence of life imprisonment without possibility of release for a conviction under Minn.Stat. § 609.185(4). *See* Act of May 20, 1993, ch. 326, art. 4, § 15, 1993 Minn. Laws 1974, 2030. Then, only two years later, the legislature amended Minn. Stat. § 260.115, subd. 1 (1998) to require automatic district court jurisdiction over 16– and 17–year–olds charged with first-degree murder. *See* Act of May 25, 1995, ch. 226, art. 3, § 17, 1995 Minn. Laws 1753, 1806–07. We presume that these amendments were passed by the legislature "with deliberation and full knowledge of all existing legislation on the subject and regarded by the lawmakers as being part of a connected whole."

*Kaljuste v. Hennepin County Sanatorium Comm'n,* 240 Minn. 407, 414, 61 N.W.2d 757, 762 (1953). Therefore, we must assume that the legislature intended the mandatory sentence of life imprisonment without possibility of release to apply to 17–year–olds convicted of first-degree murder of a peace officer.

Chambers points out that there are only 14 other individuals currently serving sentences of life without possibility of release. However, this does not make the punishment so unusual as to establish that our society has "well nigh" rejected the sentence altogether. Additionally, the fact that Chambers is the only person to be so sentenced for a crime committed while under the age of 18 does not make the punishment so unusual as to constitute a violation of the Constitution.

The real issue before us today is not whether a sentence of life imprisonment without possibility of release for a first-degree murder of a peace officer is constitutional, "but whether persons under 18 are thought to be specially exempt from it." *Stanford,* 492 U.S. at 370, n. 2, 109 S.Ct. 2969 Federal courts have upheld both capital sentences and sentences of life imprisonment without possibility of release for those under 18–years–old. *See id.* at 380, 109 S.Ct. 2969 (upholding sentence of capital punishment as applied to 16– and 17–year–olds convicted of murder); *Harris,* 93 F.3d at 581 (upholding sentence of life imprisonment without possibility of release as applied to 15–year–old convicted of murder). In recent years, we have twice upheld lengthy sentences imposed on 15–year–olds convicted of first-degree murder. *See Mitchell,* 577 N.W.2d at 481 (upholding sentence of life imprisonment as applied to 15–year–old convicted of first-degree murder); *State v. Ouk,* 516 N.W.2d 180 (Minn.1994) (upholding consecutive sentences of two life imprisonment sentences and two 180–month sentences as applied to 15–year–old convicted of murder). Thus, Chambers has failed to meet his heavy burden of proving that his sentence is "well nigh universally rejected," and we conclude that, as applied to Chambers, the sentence of life imprisonment without possibility of release does not constitute cruel or unusual punishment.

In conclusion, we hold that the trial court did not abuse its discretion in any of its rulings and that the conviction and sentence are amply supported by law and fact. Finding no merit to Chambers' multiple assignments of error, we affirm the conviction and sentence of the trial court.

Affirmed.