**STATE of Minnesota, Respondent,**

v.

**Olivier St. James GRAYSON, Appellant.**

No. C1–95–349.

Supreme Court of Minnesota.

April 19, 1996.

Rochelle R. Winn, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey III, Attorney General; Susan Gaertner, Ramsey County Attorney, and Mark Nathan Lystig, Assistant County Attorney, St. Paul, for respondent.

## OPINION

PAGE, Justice.

Olivier St. James Grayson was convicted by a Ramsey County District Court jury of first-degree murder in violation of Minn.Stat. § 609.185(1) (1994), first-degree murder in violation of Minn.Stat. § 609.185(2), and second-degree murder in violation of Minn.Stat. § 609.19(1) (1994) for the April 1994 sexual assault and murder of Rebecca Ruppert. The trial court entered judgments of conviction and sentenced Grayson to life imprisonment without the possibility of parole for each of the first-degree murder convictions. The trial court also ordered that Grayson's prison earnings be paid as restitution for Rebecca Ruppert's funeral expenses and for the costs associated with raising her child.

In this direct appeal, a number of issues are raised: (1) whether the trial court abused its discretion by allowing into evidence testimony relating to Grayson's alleged hatred of white women and his familiarity with the political tenets of Malcolm X; (2) whether Grayson's constitutional rights were violated by the trial court allowing into evidence testimony relating to his alleged hatred of white women and his familiarity with the political tenets of Malcolm X; (3) whether the prosecutor engaged in persistent and prejudicial misconduct which denied Grayson a fair trial; (4) whether it was an abuse of discretion to require Grayson to pay restitution for raising Rebecca Ruppert's son; and (5) whether it was error for the trial court to adjudicate Grayson guilty and sentence him for the two first-degree murder convictions where the convictions were based on the same acts involving the same victim.

Rebecca Ruppert was found dead in her apartment at 995 McLean, Apartment 202, in St. Paul at approximately 7:00 p.m. on April 24, 1994. Ruppert, a 19–year–old white female, lived in the apartment with her young son, Andrew. On Saturday, April 23, Ruppert spent the day visiting her mother and shopping with her brother's fiancée. She had an early dinner at her brother's house with her brother, his fiancée, her mother, and her son, and returned to her apartment between 6:30 and 7:00 p.m.[1] After she returned to her apartment, Ruppert and her mother had a brief phone conversation, sometime around 8:00 p.m. A friend of Ruppert's, Amy Schowalter, talked with Ruppert on the phone sometime around 8:20 p.m. That call was interrupted when Ruppert's father called to make arrangements for a furniture refinishing project the two of them were planning for the next day. Ruppert also talked with her boyfriend on the phone sometime between 8:00 and 9:00 p.m. Between 9:00 and 9:15 p.m., Ruppert called Amy Schowalter and left a message on Schowalter's answering machine.

---

1. Because she planned to clean her apartment and did not want her son exposed to the chemicals she was going to use, Ruppert arranged for him to spend the night with her mother.

The following morning, Ruppert's mother phoned her at about 8:30 a.m. and reached Ruppert's answering machine. Throughout the day, Ruppert's mother placed a number of calls to Ruppert, but was unable to reach Ruppert. Eventually, Ruppert's mother and father went to the apartment building in an attempt to contact Ruppert. They were unsuccessful in gaining access to the building until a building resident opened the security door. At Ruppert's apartment they found the door locked, and there was no response when they knocked. Becoming alarmed, Ruppert's mother asked a building resident if she could use her phone to call 911. Shortly thereafter, the building manager arrived and opened the door to Ruppert's apartment and allowed Ruppert's parents to enter the apartment where they discovered Ruppert's body, partially clothed, lying posed on the floor in one of the apartment's two bedrooms.

When found, Ruppert was lying on her back on the carpeted floor with her legs and arms spread apart. She was clothed only in a blue t-shirt which came to her waist. Dried blood was smeared on her face, abdomen, inner thighs and shoulders, as well as on the front of her t-shirt. Purple paint was drizzled on her abdomen and upper thighs. A pair of green nylon stockings was draped over the upper portion of her right thigh. The word "nigger" was written above her right knee and "lover" was written below the right knee. On the left thigh, the word "lover" or "lower" appeared, and a circled "Z" was on her chest. The writings appeared to have been done in ball point pen.

The crime scene investigation revealed two halves of a torn condom wrapper in the bedroom. However, no used condom was found. A pair of men's jockey style underwear was found on Ruppert's bed. A bloody palm print was found on the bedroom wall. Investigators determined that the only thing missing from Ruppert's apartment was her apartment key. A black-handled knife with a three-inch blade was found in the kitchen sink inside a water-filled plastic container which smelled of cleaning solution.

The St. Paul Police arrived shortly after Ruppert's body was found, and their investigation into her death began immediately.

They interviewed a number of the building's residents, including an individual who identified himself as Olivier Grayson. Grayson lived in Apartment 306 with his wife, Donna Fields, along with their daughter and Fields' daughter. During that interview, Grayson indicated that he had left the apartment building at 7:30 p.m. on the night of the 23rd, did not return until 6:30 a.m. on the 24th, and had not heard or seen anything unusual.

On April 26, homicide investigators conducted a phone interview with Grayson. At one point during that interview, Grayson indicated that he had been in Ruppert's apartment on several occasions. When asked to come to police headquarters to have his fingerprints checked, Grayson changed his story and indicated that he had only been in Ruppert's apartment on one occasion and then, only as far as the front door. Grayson eventually agreed to come to the police station on April 27 for further questioning.

Prior to Grayson's arrival at the police station on April 27, the police learned that the bloody palm print found at the crime scene matched Grayson's known print. When Grayson arrived for questioning, he was given the *Miranda* warning. Before any questions were asked about Ruppert's death, Grayson stated to the interviewing officers that he had previously been arrested and convicted of sexually assaulting the 15–year–old daughter of a former girlfriend. During the questioning, he denied being in Ruppert's apartment on April 23 and provided the investigators with an alibi witness by the name of Shirley Marie Berry. Grayson claimed he had been with Berry between 7:30 p.m. on the 23rd and 5:00 a.m. on the 24th.

Grayson was arrested following the questioning. After Grayson's arrest, the police executed search warrants on Grayson's apartment. A pair of men's white jockey underwear, similar to the ones found in Ruppert's apartment, and a leather hat, marked with the letter "X" on the front, were seized. In addition, the police seized a black-handled knife similar in length and design to the knife found in the plastic container in Ruppert's apartment. The police also interviewed Berry after Grayson was arrested. Berry initially corroborated Grayson's story,

indicating that she and Grayson had been together between the 12 hour period from approximately 6:00 p.m. or 7:00 p.m. on the 23rd and 6:00 a.m. or 7:00 a.m. on the 24th. A short time after that interview ended, Berry contacted the police and changed her story, informing them that Grayson had asked her to provide him with an alibi for April 23 because he could not account for a period of time when he claimed he was riding around drunk.

An autopsy was performed by the Ramsey County Medical Examiner's Office. At trial, the medical examiner described Ruppert's injuries as follows: (1) soft tissue injuries about the face caused by a blunt object; (2) ligature to the subject's mouth; (3) sexual assault; (4) manual strangulation; and (5) sharp force injuries. According to the coroner, Ruppert died as a result of asphyxia due to manual strangulation sometime during the 12–hour period preceding 6:53 a.m. on April 24.

Specifically, the autopsy revealed that Ruppert suffered bruises and contusions to her face and upper shoulders; injuries to her neck, including an accumulation of blood beneath the surface of the face, petechia to the skin, and a fracture of the hyoid bone; bruises, abrasions, and lacerations to her external genitalia, suggesting that she had been sexually assaulted; and multiple stab wounds to her body, including seven stab wounds to the neck region, a puncture wound to the chest area, a stab wound to the chest area which penetrated the lung tissue, and a stab wound to her left fourth finger. According to the medical examiner, Ruppert was already dead or in a morbid state prior to being stabbed. Three negroid pubic hairs were retrieved from Ruppert's pubic hair. The medical examiner also determined that Ruppert's pubic hair had been burned and found ashes on her inner thigh and genital area.

Grayson testified in his own defense at trial. He admitted that the underwear found on Ruppert's bed was his. He also admitted that the bloody palm print found in the bedroom where Ruppert's body was discovered was his. DNA analysis in essence confirmed that the underwear was Grayson's and a comparison with Grayson's known palm print confirmed that the bloody palm print found in Ruppert's bedroom was Grayson's.

Grayson explained his underwear and palm print being in Ruppert's apartment as follows: As he was leaving the apartment building around 7:30 p.m. on the 23rd, Ruppert yelled to him from her window and started a conversation. Ruppert then came outside and began to ask him "strange" questions regarding when he was returning to the apartment. Before the conversation ended, Ruppert indicated that she wanted him to stop by her apartment when he returned. In case she was asleep when he returned, Ruppert gave him her apartment key so he could get in. After returning from Minneapolis sometime before 4:00 a.m. on the 24th, he went to Ruppert's apartment and knocked on her door. Getting no answer, he tried the door and found it unlocked. He entered the apartment, proceeded down the hallway, and discovered Ruppert's body. After calling her name a couple of times, he checked for a pulse and put his head to her chest to see if she was breathing. Finding no pulse or heartbeat, he panicked, pulled the window shades down, and checked to see if anyone saw him enter the apartment. While looking out the window, he touched the wall. At some point, he slipped and fell into a pool of blood. Not wanting to go home in blood-stained clothing, he went to his car, grabbed a pair of work pants, and went back to Ruppert's apartment to change. Rolled up in the work pants was a pair of "work underwear" which he placed on Ruppert's bed. After changing into the work pants, he left the apartment, locking the door behind him and inadvertently leaving the underwear on the bed.

 The first issue we address is whether the trial court abused its discretion by admitting into evidence testimony related to Grayson's alleged hatred of white women and his familiarity with the political views of Malcolm X and the hat with the initial "X." Only relevant evidence is admissible at trial. Minn. R. Evid. 402. Evidence is relevant when it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evi-

dence." Minn. R. Evid. 401. Relevant evidence may be excluded, however, when its probative value is outweighed by the danger of unfair prejudice. Minn. R. Evid. 403. "[E]videntiary * * * rulings generally rest within the trial court's discretion and will not be reversed absent a clear abuse of discretion." *State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990). A defendant who claims that the trial court erred in admitting evidence bears the burden of showing the error and any resulting prejudice. *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994). Evidentiary errors warrant reversal if "there is any reasonable doubt the result would have been different had the evidence not been admitted." *State v. Naylor,* 474 N.W.2d 314, 318 (Minn.1991).

Grayson contends that the evidence related to his alleged hatred of white women and his knowledge of the political views of Malcolm X was irrelevant to the charged offense and highly prejudicial because "[the evidence] had the potential to inflame the predominately white jury against [him]." The prosecutor offered evidence of Grayson's alleged hatred of white women through testimony of several witnesses, including: (1) Shirley McClellon; (2) Earl Brown; and (3) Shirley Berry. Prior to questioning the witnesses about Grayson's views regarding white women, the prosecutor sought and was granted permission by the trial court to conduct the inquiry. Both McClellon and Brown testified that Grayson referred to white women as "bitches." Berry testified that Grayson said he "hated" white women. The prosecutor, over Grayson's objection, also had admitted into evidence the hat with the initial "X" on it and cross-examined Grayson regarding the hat and his knowledge of Malcolm X's political views.[2]

■ The state argues that there was no abuse of discretion because, while under its theory of the case Ruppert's murder was not racially motivated, the evidence was relevant to disprove and rebut Grayson's story as to why he accepted Ruppert's apartment key and why he was in Ruppert's apartment the night Ruppert was murdered. Under the state's theory of the case, Ruppert would not have invited Grayson to her apartment nor offered him the apartment key because she did not date black men and did not like older men, and Grayson would not have accepted the key from Ruppert because he did not like white women. The state also argues that, in any event, the admission of the evidence did not result in any prejudice to Grayson.

We conclude that the trial court did not abuse its discretion by allowing into evidence testimony regarding Grayson's view of white women. Given the circumstances of Ruppert's murder and Grayson's explanation as to how he came to be in Ruppert's apartment

---

2. On cross-examination by Assistant County Attorney Robert Plesha, Grayson was asked the following questions:

Q. Now, when the search warrant was done of your apartment there was a hat that was found that's marked as Exhibit 110. I take it that that X there doesn't stand for Super Bowl 10, does it?

A. It means hatred?

Q. What does the X stand for?

A. Malcolm X.

Q. And what does Malcolm X stand for?

Ms. O'Neill: Objection, relevancy.

The Court: No, you may answer.

A. He was a change. He doesn't stand for hatred at all. Did you read the book?

Q. No, but I would like you to read some passages.

A. You need to read the whole book.

Q. Did Malcolm X ever state that the white man was the devil?

A. Yes, he did.

Ms. O'Neill: Objection, Your Honor to this entire line of questioning. Entirely inappropriate.

The Court: Sustained.

Q. Did Malcolm X ever state anything with respect to black men dating white women?

Ms. O'Neill: Objection, same objection.

The Court: I will allow that.

A. I've read many articles concerning black men and white women.

Q. Well, in particular, those of Malcolm X, whose hat you had?

A. There is a passage in there concerning that.

Q. And what does that passage state?

A. I could not word by word verbatim tell you what it states.

Q. Would it be fair to summarize it by saying that he did not advocate interracial marriage or dating?

A. I would probably agree with that. You must remember, that's before he took the haage to Mecca. Once he came back from Mecca his whole idea of white people were totally different.

Q. I appreciate that.

that night, the evidence legitimately called into question Grayson's story as to what he was doing in her apartment the night of the murder. We further conclude that the probative value of this evidence was not outweighed by the danger of unfair prejudice. Because the evidence relating to Grayson's view of white women was relevant and not unduly prejudicial, its admission at trial was not error.

■ The admission of the evidence relating to Malcolm X is another matter. First, admitting the "X" hat into evidence was improper. The hat did not tend to "make the existence of any fact * * * more probable or less probable" and was therefore not relevant. *See* Minn. R. Evid. 401. From the record, it appears that the hat had absolutely no connection with and played no role in Ruppert's murder. Thus, the hat should not have been admitted into evidence, and cross-examination related to the hat should not have been permitted.

The testimony resulting from Assistant County Attorney Plesha's cross-examination of Grayson as to Grayson's knowledge of Malcolm X's political views was no more relevant. Grayson's knowledge of Malcolm X's political views had no bearing on the issues presented at trial. While the state now claims that the Malcolm X evidence was offered for the same purpose as the evidence relating to Grayson's view of white women, that claim is suspect. It is suspect because the state never made any effort at trial to connect Grayson's knowledge of Malcolm X's political views with any fact in issue. Indeed, our review of the record indicates that Grayson's knowledge of Malcolm X's political views was not probative of any issue at trial. Mere knowledge of another's views and writings does not mean that one subscribes to them or acts in conformity with them. Yet, the message sent to the jury was that because Grayson had knowledge of Malcolm X and his political views, he personally adopted those views and acted in conformity with them.

■ Further, we believe that the admission of the Malcolm X evidence, even if it had been relevant, was highly prejudicial. The name Malcolm X, for many people, acts as a lightning rod with negative racial overtones. We have no doubt that while the image of Malcolm X may have changed in some people's minds over the years, it is an image which in many people's minds raises the spectre of racial hatred. The cross-examination related to Malcolm X's view that the white man was the devil[3] and his view of interracial dating had the potential to inflame the biases of the predominately white jury in this trial of a black man accused of the sexual assault and murder of a white woman. The potential for prejudice is so great that the court can only wonder what the prosecutor's purpose was in inquiring about Malcolm X. While we cannot from this record ascribe to the prosecutor any improper racial motivation for the introduction of this evidence, we can say, on the facts of this case, that any probative value the evidence could possibly have had was far outweighed by the danger of unfair prejudice. Its use in this trial, with its strong potential for inflaming the jury, was improper. *See State v. Baker,* 280 Minn. 518, 527, 160 N.W.2d 240, 245 (1968) (the court noting that "[t]here can be little doubt that a remark appealing to racial prejudice might tend to inflame the minds of the jurors").

■ Having concluded that the trial court abused its discretion in admitting the evidence related to Malcolm X, we must determine whether the error was so prejudicial as to entitle Grayson to a new trial. The test is "whether there is any reasonable doubt the result would have been different if the evidence had not been admitted." *Naylor,* 474 N.W.2d at 319–20. We conclude that there is no reasonable doubt "the result would have been different if the evidence had not been admitted." This is not a case like *State v. Harris,* 521 N.W.2d 348 (Minn.1994), where we granted the defendant a new trial because he was denied a fair trial. In *Harris,* we

---

3. The trial court sustained Grayson's objection to the specific question asked. However, no cautionary instruction was given. Further, given the insidious nature of race based bias, we cannot say with any certainty that a curative instruction would have prevented the prejudicial impact of the question.

found multiple trial court errors and persistent prosecutorial misconduct. Here, other than the admission of the Malcolm X evidence, we have found no other serious trial error.

The evidence of Grayson's guilt is overwhelming, and we have little doubt that the jury would have found him guilty in the absence of the Malcolm X evidence. In particular, Grayson's palm print was discovered at the murder scene, he admitted that the palm print was his, and the palm print was matched with his known print; he admitted that the underwear found at the crime scene was his underwear, and analysis of the DNA found on the underwear confirmed a match with his DNA profile; he could not be excluded as the source of the negroid pubic hair found on Ruppert's body; and the handwriting found on Ruppert's body was similar to his.

In addition, as a witness, Grayson lacked credibility. He admitted, on direct examination, that he lied on several occasions during the course of the murder investigation. He lied to the police officer who was canvassing the apartment building after the discovery of Ruppert's body when he told the officer that he had neither seen nor heard anything relating to Ruppert's death. During the phone interview, he lied about the number of times he had been in Ruppert's apartment. During the initial interrogation at the police station, he lied about being in Ruppert's apartment on the night of the murder, and he lied about being with Shirley Berry. Further, for the jury to have believed Grayson's incredible story as to what he was doing in Ruppert's apartment on the night of the murder, the jurors would have had to suspend their disbelief—a feat which reasonable jurors would have found difficult to do.

■ The next issue raised by Grayson is whether his constitutional rights under the First Amendment of the United States Constitution were violated when he was cross-examined regarding his familiarity with the views of Malcolm X.[4] Grayson argues that his First Amendment rights were violated

because "the jury was allowed to draw adverse inferences from evidence of appellant's abstract beliefs concerning race and tenets of Malcolm X," which he contends "may not be taken into account to determine guilt unless the evidence is relevant and tied to the charged offense." The First Amendment "protects an individual's right to join groups and associate with others holding similar beliefs." *Dawson v. Delaware*, 503 U.S. 159, 163, 112 S.Ct. 1093, 1096, 117 L.Ed.2d 309 (1992). However, there is no per se barrier to the admission of evidence concerning one's beliefs and associations where the evidence is relevant. *Id.* at 164–65, 112 S.Ct. at 1097.

In *Dawson*, the Supreme Court held that the admission of evidence at Dawson's sentencing hearing concerning his membership in the Aryan Brotherhood was constitutional error. *Id.* at 165, 112 S.Ct. at 1097. According to the Court, the First Amendment protects one's "right to join groups and associate with others holding similar beliefs." *Id.* at 163, 112 S.Ct. at 1096. The Court stated that the admission of the Aryan Brotherhood evidence merely established Dawson's abstract beliefs and was not relevant to rebut any mitigating evidence. *Id.* at 166–67, 112 S.Ct. at 1098–99. In this case, the evidence regarding Grayson's familiarity with the political views of Malcolm X suffers from the same defects. The evidence was not relevant to any issue at trial and merely established Grayson's knowledge of abstract beliefs.

■ Further, the evidence invited the jury to infer that Grayson supported Malcolm X's views and had adopted similar beliefs. We can only conclude that the prosecutor's cross-examination of Grayson with respect to Malcolm X was an attempt to highlight the abstract views of Malcolm X and not those of Grayson, thus creating a strong possibility that the jury would attribute the beliefs of Malcolm X to Grayson. Allowing that cross-examination was constitutional error.

■ Constitutional error is not reversible error where the error is "harmless beyond a reasonable doubt." *State v. Larson*,

---

4. While Grayson in his statement of the issues also asserts that the admission of evidence related to his alleged hatred of white women was a

First Amendment violation, he makes no serious argument in that regard, and we find no such violation.

389 N.W.2d 872, 875 (Minn.1986). As we indicated above, the evidence against Grayson is overwhelming. Because of the overwhelming nature of the evidence against Grayson, we conclude that the trial court's error in admitting the Malcolm X evidence was harmless beyond a reasonable doubt. However, we take this opportunity to again remind prosecutors that they have "an overriding obligation, shared by the court, to see that [sic] defendant receives a fair trial, however guilty he may be." *Harris*, 521 N.W.2d at 355 (quoting *State v. Sha*, 292 Minn. 182, 185, 193 N.W.2d 829, 831 (1972)).

We have recently noted the impact of racial bias in our judicial system. Minnesota Supreme Court Task Force on Racial Bias in the Judicial System, Final Report (May 1993); *see also State v. Bowles*, 530 N.W.2d 521, 525 n. 1 (Minn.1995) (referring to the Final Report). Our concern over the impact of such bias is heightened when prosecutors engage in trial tactics that represent a disregard for the rights of the accused. The judicial branch of government is premised on doing justice, that is, on being fair and impartial to all who come before it. Race-based bias, benign or otherwise, has no place in the judicial system.

The third issue we must address is whether the prosecutor engaged in misconduct which denied Grayson a fair trial. In alleging prosecutorial misconduct, Grayson points to a number of acts by the prosecutor during the trial. We need not recite them here. It is sufficient to say that our review of the record satisfies us that, to the extent any of the acts constituted misconduct, they did not play a substantial role in the verdict and did not result in any prejudice to Grayson. *See State v. Parker*, 417 N.W.2d 643, 647 (Minn. 1988) (test is "whether the improper comment likely played a substantial part in influencing the jury to convict").

■ The fourth issue is whether the trial court abused its discretion when it ordered Grayson to pay restitution for the cost of raising Ruppert's son. This issue is based on Grayson's assertion that the state failed to establish a factual basis for the award of restitution in addition to failing to show that the victim's losses were a direct result of his conduct. Minnesota Statutes sections 611A.04 and 611A.045 (1994) set forth a victim's right to an order for restitution and the procedure for issuing such orders. The statutes contemplate that before restitution can be ordered, the victim's loss must be documented. That was not done in this case. The record is devoid of any documentation of the victim's loss. *See State v. A.C. Ford, Jr.*, 539 N.W.2d 214, 215 (1995) (record of extent of economic loss is required before a trial court may order restitution). Therefore, we vacate the trial court's restitution order.

■ Grayson's final issue is whether the trial court erred by adjudicating him guilty of two counts of murder in the first-degree where both convictions were based on the same act involving the same victim. The state agrees with Grayson and recommends that we vacate Grayson's conviction and sentence for murder in the first-degree in violation of Minn.Stat. § 609.185(1) and affirm the conviction and sentence for first-degree murder in violation of Minn.Stat. § 609.185(2). We have said that a defendant cannot be convicted "twice for the same offense against the same victim on the basis of the same act." *State v. Ture*, 353 N.W.2d 502, 517 (Minn.1984); *see also* Minn.Stat. § 609.04, subd. 1 (1994). Therefore, we affirm Grayson's conviction and sentence under Minn. Stat. § 609.185(2) and vacate the conviction and sentence under Minn.Stat. § 609.185(1).

Affirmed in part and vacated in part.