STATE of Minnesota, Respondent,

v.

American LaVerne MORRIS,
Appellant.

No. C1–98–1869.

Supreme Court of Minnesota.

Feb. 10, 2000.

Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Michael Hatch, Attorney General, St. Paul, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Asst. Ramsey County Attorney, St. Paul, for respondent.

## OPINION

LANCASTER, Justice.

After a jury trial in Ramsey County District Court, appellant, American La-Verne Morris, was convicted of one count of murder in the first degree, criminal sexual conduct, Minn.Stat. § 609.185(2) (1998).[1] Appellant argues that the circumstantial evidence presented at trial was insufficient to prove that he committed the murder of the victim, Marilyn Ford, during a sexual assault. Appellant also argues that the trial court erred in excluding evidence about the victim's reputation. We affirm.

On March 26, 1998, forty-five-year-old Marilyn Ford resided in the lower duplex of 758 East Maryland Avenue in St. Paul. Ford lived with her brother Willy Chambers and Chamber's girlfriend Rochelle Banks. Banks was temporarily away from the residence at that time.

Appellant American Morris, Banks' stepfather, also lived in the duplex. Appellant awoke at about 5:20 a.m. on March 27, 1998, and went to work as a day laborer. Chambers awoke at 11:00 a.m. when James Whitelow, Ford's boyfriend, arrived at the apartment.

At about noon Lillian Beard, who lived in the upper half of the duplex, came home and discovered Ford lying face-up in the grass alongside the house. Beard brought Chambers and Whitelow out to the front yard. A passerby, Carolyn Fick, stopped and dialed 911 on her cellular telephone and handed it to Chambers. Fick, a nurse, checked for a pulse in Ford's neck, but there was none. Paramedics arrived shortly thereafter and pronounced Ford dead.

The police received the 911 call at around noon, and officers arrived just after the paramedics. Detective Sgt. Findley interviewed Beard about past arguments between Ford and appellant. Beard told the police she had last seen Ford early that morning. Beard said Chambers was upstairs in Beard's apartment, and sometime around 1:30 a.m. Ford joined them on the back landing and said she was going outside to "get some air."

Chambers told one officer he last saw his sister at 2:00 that morning, awake and alone in her bedroom. Chambers said he went to Beard's apartment after he saw his sister in bed. To a different officer, Chambers said that Ford was with appellant in her bedroom when he last saw her. Chambers said he interrupted the two while they were engaged in sexual intercourse. Chambers said he asked who was there and Marilyn Ford answered either, "We're here" or "We are."

During these police interviews, Dr. Michael McGee, the Ramsey County Medical Examiner, arrived at the scene and viewed Ford's body. Dr. McGee noted that Ford was lying on her back with her arms stretched over her head. Her body was partially obscured by hedges and in a full state of rigidity. When he rolled the body over, Dr. McGee found dirt inside Ford's pants. The doctor concluded that Ford was killed elsewhere and dragged to the yard. He estimated that Ford died ten to twelve hours before her body was found at noon.

Dr. McGee, along with Sgts. Findley and Luna, then went inside the lower level of the Maryland Avenue duplex. They observed small traces of blood on a kitchen cabinet, kitchen floor, living room carpet,

---

1. Minnesota Statutes § 609.185 provides:
   **Murder in the first degree.**
   Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
   \* \* \* \*

   (2) causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person or another[.]

front entry wallpaper, and the inside of the front screen door. There was also blood on the sheet and mattress cover from Ford's bed. The comforter from the bed was rolled up on the floor of the back bedroom. Sgt. Luna found a pillowcase, sheet, and a woman's scarf inside the comforter. The comforter had bloodstains soaked through on both sides. Sgt. Luna concluded that the victim's body had been placed on the other bed in the back bedroom because there were thick irregular blood patterns that went through a quilt, two sheets, and directly into the mattress.

The police went to appellant's workplace and brought appellant to the St. Paul Police Department at about 3:45 p.m. for questioning. When Sgt. Findley told appellant that Ford was dead, appellant did not show emotion but said simply "When?"

Appellant stated that he had worked until 5:00 p.m. the previous day, and then cashed his paycheck and bought some alcohol. Appellant walked to the home of his stepdaughter, Kathryn Banks. Banks and appellant next stopped at Susan Tolliver's before walking to the Maryland Avenue duplex. Inside, appellant found Ford and Chambers watching television. Appellant and Kathryn Banks left shortly thereafter to go to Nancy Banks' house. Appellant said he returned to find Chambers and Ford still watching television.

Appellant told police that Chambers left about midnight. Appellant said Ford then asked him if he wanted to have sex with her in exchange for his providing crack cocaine. Appellant told police they went into Ford's bedroom to have sex. Chambers soon interrupted them by opening Ford's door. Appellant gave two versions about how the interruption occurred, first stating that Chambers knocked and entered when appellant was standing next to the bed. Appellant later told police that Chambers did not knock and instead discovered appellant in bed with Ford. After the interruption, appellant stated he cleaned up in the bathroom and went out through the back bedroom to join Chambers for a cigarette. Appellant told Sgt. Findley that Ford left at about 12:45 a.m., telling the men she was going to meet a man named Al.

Appellant said that at 3:00 a.m. Lillian Beard knocked on the door and asked Chambers to join her upstairs. Chambers left but then returned a few minutes later. Both appellant and Chambers then went to bed, and appellant awoke at 5:20 a.m. and left for work.

The police arrested appellant at the end of the interrogation. They then obtained and executed a search warrant for his home. The police found appellant's machete under Ford's bed, but they did not believe the machete was used in Ford's murder.

At trial James Whitelow testified that Ford was afraid of appellant because he had once pulled a knife on her. Whitelow identified the machete found under Ford's bed as belonging to appellant. Whitelow stated that Ford was not sexually interested in appellant.

Appellant's ex-girlfriend Nancy Banks also linked the machete to appellant and answered affirmatively when asked whether appellant always carried the machete with him. Banks also testified that Ford and appellant had several arguments. Banks stated that appellant said "a number of times" he was going to kill Ford. Banks testified she was with appellant and Ford at their apartment from 10:00 p.m. on March 26 until appellant walked her home at about 11:45 p.m.

Susan Tolliver testified that she and her husband were outside their home at about 11:00 or 11:30 p.m. on March 26 when they ran into appellant, Ford, and Lillian Beard. Tolliver said Ford and Beard walked away to buy crack cocaine for appellant. Appellant spoke with Tolliver and her husband for a few minutes and then appellant walked home.

Lillian Beard testified that Chambers was in her apartment at about 1:00 a.m. on

March 27 when Ford came up to say she was going out. Chambers asked why she was going out so late, and Ford responded that she wanted to get some air. Chambers stayed with Beard before going downstairs at about 2:00 a.m. Beard testified that she once intervened in an argument between Ford and appellant. Beard said appellant had a knife in his hand and Beard heard appellant say to Ford, "I'll kill you, bitch."

Ford's daughter Iquittia Carruthers testified that during November 1997 Ford stated that appellant wanted to have sex with her. Ford said she did not want to have sex with appellant and was afraid of appellant because he once slapped her. Carruthers testified that Ford told her that "if like something happened to her [Ford] that he [appellant] would be the one to do it."

Willy Chambers testified that during the evening of March 26, he and Ford visited Lillian Beard in Beard's apartment. Ford left before he did. When Chambers went downstairs at about 2:00 or 2:30 a.m., he found the back door locked. Chambers saw that Ford's bedroom door was shut and, upon entering, saw appellant on top of Ford. Ford was lying nude on her back and appellant was holding Ford's legs up over his shoulders with his arms. A white comforter was under them on the bed. Chambers asked, "Who's in here?" and appellant replied, "We are." Chambers told police on March 27 that Ford answered him but at trial Chambers said it was appellant who spoke. Chambers testified that Ford neither moved nor said anything, but Chambers thought he had walked in on the two having consensual sex.

Chambers returned to the living room and appellant emerged about fifteen or twenty minutes later, using a less direct route that passed through the bathroom, a back bedroom, and then the kitchen. Appellant offered Chambers a cigarette and soon Beard knocked on the door. Chambers accepted her offer to go upstairs for a beer. Chambers returned about an hour later and found the back door locked. Appellant was sitting on the couch watching television, but Ford's bedroom door was now open. When Chambers asked about his sister, appellant said she had left for some guy's house. Chambers testified that he went into both bedrooms looking for Ford but did not find her. He did notice, however, that the comforter was now "balled up" on the floor of the Banks' bedroom.

Appellant's co-worker Murray Timberlake testified that on March 25, 1998, appellant said he wanted to get an apartment with a woman, but she did not want to. Timberlake testified that appellant said the woman was "messing around" with somebody else. Timberlake stated that two days later, at work on the morning of March 27, appellant told him a woman ran off with two hundred dollars of his money. According to Timberlake, appellant said, "I caught her with it. I killed the bitch."

Dr. McGee testified about the autopsy of Marilyn Ford. She had blood on her face and her shirt that Dr. McGee believed came from Ford's nose and mouth as a result of blunt trauma. Ford had significant bruises and scrapes on her face, hands, arms, shoulder, neck, and inside her lips. According to Dr. McGee, the bruises inside Ford's lips were consistent with someone having placed an arm or other object over Ford's mouth. The bruises on her arms were consistent with being held down. Ford also had pinpoint bleeding in her eyes and fluid in her lungs, which indicated she had been strangled. The bruises on her neck were consistent with manual strangulation. The medical examiner could not screen Ford for cocaine in her system because there was no urine in her bladder at the time of the autopsy. In Dr. McGee's opinion, Ford had defensive wounds on her left upper extremities.

Dr. McGee observed that Ford's underwear was found inside out with only one

leg through the waistband. Dr. McGee concluded that Ford had been redressed after death. A note with the name "Tommy Jr." and a phone number was also found in the pocket of her shorts. None of the people the police talked to recognized the name or the phone number and there is no evidence in the record that the police called the number.

Dr. McGee conducted a sexual assault examination and found sperm in Ford's vagina and around her anal region that possibly was drainage from the vagina. Dr. McGee testified that the drainage may have been post-mortem. A DNA test linked the sperm to appellant with a random match probability of 1 in 396,000 African Americans. There was no evidence of any traumatic injury to Ford's genital area. Dr. McGee testified that an unconscious person may not show signs of sexual assault trauma because of their muscle flaccidity or a lack of resistance. Dr. McGee noted a conscious person may also show no signs of genital trauma after an assault and that an absence of trauma does not mean no assault occurred.

Ford had an elevated acid phosphate level in her vagina that led Dr. McGee to conclude the sperm was deposited close to the time of Ford's death. Dr. McGee concluded that Ford died from a lack of oxygen due to manual strangulation during the course of a sexual assault:

Q: What was happening to her when she died, based on your training and experience?

A: Based on the scene investigation and the examination of Mrs. Ford's body, I think she was sexually assaulted and during the course of the sexual assault I think she was manually strangled and received a beating. I'm not exactly sure at what sequence this occurred. The beating consisted of blows to her facial area, pressure applied to her mouth to either stop her from breathing or trying to quiet her, as well as blunt trauma being applied to the neck region in the form of a hand, strangling her, either to quiet her or kill her. This all occurred during the performance, I believe, of a sexual assault.

The following exchange occurred on cross-examination of Dr. McGee by defense counsel:

Q. Doctor, you had said that you believed this was possibly a death in the course of a sexual assault; isn't that correct?

A. Yes.

Q. But, doctor, you cannot say to any degree of medical certainty that in fact Marilyn Ford died in the course of a sexual assault, can you?

A. All I can tell you is – all I can tell you is what the results of the analysis in the lab and the examination of the body suggest.

Q. And so, to note, you cannot say to a degree of medical certainty that in fact she died in the course of criminal sexual conduct?

A. I think she did.

Q. Your final – Your final anatomic diagnosis is death by manual strangulation?

A. That's true.

A forensic scientist testified about DNA testing on bloodstains found on the T-shirt appellant wore when he was arrested. The scientist concluded that the blood on appellant's shirt came from Ford with a random match possibility of 1 out of 35,200 for African Americans, a number the scientist considered "quite uncommon." The scientist excluded appellant as the source of the blood found on his shirt.

The scientist also tested blood found on appellant's ring and a sock worn at the time of arrest. The scientist concluded that at least two people contributed to a DNA mixture in blood found on appellant's sock and ring. She concluded the blood was a mixture consistent with both Ford's and appellant's blood.

The blood found on a wallpaper sample from the kitchen was also tested. The wallpaper sample had the same statistical certainty for Ford's blood as the sample on appellant's T-shirt.

Ford's comforter had several large bloodstains that were diluted by what one scientist suspected was urine. Dr. McGee noted that strangulation victims often release their urine. The scientist found a mixture of DNA on the comforter and concluded both Ford and appellant were possible sources, but someone else's DNA contributed to the mixture.[2]

Appellant did not testify at his trial.

## I.

Appellant argues that the trial court erred in excluding testimony concerning a statement that Chambers made to police on March 27, 1998, to the effect that Ford was a prostitute who sold sex to obtain drugs. The trial court did not allow that testimony, but ruled that if there was evidence of drug use or prostitution on the night in question, that would be admitted.

■ "Absent a clear abuse of discretion, evidentiary rulings generally rest within the trial court's discretion." *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998). In a prosecution for criminal sexual conduct, evidence of a victim's previous sexual conduct is not admitted except by court order. *See* Minn.Stat. § 609.347, subd. 3 (1998).[3] Both Minn. R. Evid. 412 and Minn.Stat. § 609.347, subd. 3, apply the rape shield law to prosecutions for criminal sexual conduct. *See State v. Friend*, 493 N.W.2d 540, 545 (Minn.1992) (applying rape shield law protections to a murder victim because the state must also prove the elements of sexual assault to convict for first-degree murder committed during a sexual assault).

■ Appellant claims that testimony about Ford's prostitution was admissible for reasons analogous to those examined in *State v. Grayson*, 546 N.W.2d 731 (Minn. 1996). In *Grayson* we concluded that the trial court did not abuse its discretion by admitting evidence that the defendant hated white women in a case where his defense involved consensual contact with a white woman. *See id.* at 736. Appellant claims that the evidence should have been admitted to support his position, as set forth in his own statements to police, that Ford's sexual intercourse with him was consensual. He essentially argues (although the argument was not articulated at trial) that because the state introduced evidence that Ford disliked, feared, and had no sexual interest in him, he was entitled to offer evidence tending to show that she was in the habit of prostituting herself, presumably even with men she disliked, feared, and had no interest in, in exchange for drugs. Thus, he claims, the evidence was not offered for the prohibited purpose of character assassination, but for the legitimate purpose of rebutting a portion of the state's case.

We have conducted a thorough examination of the trial transcript to determine what evidence was offered, what objections and arguments were made, and the timing, basis, and parameters of the trial court's evidentiary rulings.

The state filed a motion in limine to exclude references to alleged drug use or

---

**2.** James Whitelow testified that on March 26 he had sex with Ford in her bedroom before leaving the apartment at about 3:00 p.m. Ford was killed sometime around 12 a.m. on March 27.

**3.** Minnesota Statutes § 609.347, subd. 3(a) provides:
(a) When consent of the victim is a defense in the case, the following evidence is admissible:

(i) evidence of the victim's previous sexual conduct tending to establish a common scheme or plan of similar sexual conduct under circumstances similar to the case at issue. In order to find a common scheme or plan, the judge must find that the victim made prior allegations of sexual assault which were fabricated; and
(ii) evidence of the victim's previous sexual conduct with the accused.

prostitution by the victim. The morning of trial, the court repeatedly declined to rule on the motion, saying, for example: "But I just don't think it's fair to preclude it at this time if I don't see how the case is lining up," and "I can't judge that [relevance] ahead, either. It may not be, it may be. Depends." The argument touched both on whether there would be proper foundation and also whether the evidence was relevant. At that hearing, it appears to have been anticipated that some of the evidence both with respect to the defense theory and the victim's prior conduct would be offered through testimony of appellant himself:

The Court: If this is introduced you're saying it's going to come in through Mr. Morris.

[Defense Counsel]: Those statements would come in through Mr. Morris.

That exchange was followed by a discussion of whether there would be foundation for Morris' opinion. The state argued that even if there was foundation, there would have to be a showing of relevance:

[Counsel for the State]: But wouldn't the defense have to make some sort of offer of proof as to how it's relevant? It's going to be out of Mr. Morris' mouth and then it's too late. The grand jury did ask the question if she was a prostitute. She's not.

The Court: They can lay the foundation. If they can't lay the foundation it's moot. But if they do, then in the context of all of the issues at the trial, does it become something the jury should know or not know in making the decision? And I don't know that yet.

Thus, it is apparent that the trial judge was committed to making the relevancy ruling in the context of the trial as a whole, and only if foundation was established. In the end, Morris did not testify, and the

only remaining evidence at issue was the statement to police by Chambers.

After Chambers' direct examination, defense counsel, the prosecutor, and the court revisited the question of his testimony on the point here at issue. The court made clear that its rulings did not exclude testimony about Ford's "whereabouts or her movements on the night in question at all." The judge and counsel then had the following exchange:

The Court: Well, let me say this and maybe we can clear this up. Unless you show some nexus between this night, the activities of this night, and some dates previously, you don't get, because she did it this night, then to go through a whole history of when she may have done it previously.

[Defense Counsel]: Your Honor, the only nexus that I have is that Miss Tolliver said that earlier in the evening Marilyn Ford was out buying crack.

The Court: And you have a free hand on this evening in this early morning of the 26th and 27th to pursue that line of questioning.

[Defense Counsel]: May I also ask Mr. Chambers if his sister smoked crack?

The Court: This evening?

[Defense Counsel]: On the evening in question.

The Court: Yes.

It appears to us that the trial court considered all of the evidence and struck a careful balance in admitting evidence of conduct on the evening in question but not evidence of sexual conduct or drug use in general. Through the state's direct examination of one of the police officers, the jury learned of appellant's out-of-court statements to the effect that Ford engaged in consensual sex with him in order to receive cocaine.[4] The jury also heard evidence that Ford possessed cocaine the night she was killed. The excluded evidence consist-

---

4. In addition, the jury heard evidence that appellant had also told police that Ford had been "hitting on him."

ed of one statement by Ford's brother. Even assuming that Chambers would have testified consistent with his statement, there was no offer of proof with respect to the foundation for his opinion, or what he would have said about the frequency or recency of the alleged prostitution, or whether Chambers would have said that Ford had ever brought customers to her own home.

In *State v. Friend*, 493 N.W.2d 540 (Minn.1992), we stated that in "certain cases the due process clause, the right to confront accusers, or the right to present evidence will require admission of evidence otherwise excluded by the rape shield law." *Id.* at 545. In *Friend*, we upheld the trial court's exclusion of evidence offered by the defendant of the victim's "similar pattern" sexual activity. *See id.* In *Friend*, the evidence demonstrated that the victim had a broken nose, had a wound under her eye, and did not get up between the time of the sexual intercourse and the murder. *See id.* We concluded there that the trial court was free to exclude the victim's prior sexual conduct evidence under Minn. R. Evid. 403 without regard to whether exclusion was required by Minn. R. Evid. 412 or the rape shield statute. *See id.* The facts here are similar to those in *Friend*. Ford had significant bruises and scrapes on her face, hands, arms, shoulder, neck and lips, and was killed so close in time to the sexual intercourse that in the medical examiner's opinion the intercourse could even have been post-mortem.

In the context of all the evidence, we conclude that the trial court's exclusion of testimony that Chambers had told police that Ford was a prostitute who sold sex for drugs or drug money was not a clear abuse of discretion.

## II.

Appellant contends the circumstantial evidence in the record was legally insufficient to sustain his conviction for first-

degree murder committed during a sexual assault.

■ "In a criminal case, the court makes a painstaking review of the record to determine if the evidence was sufficient to permit the jury to reach the conclusion that it did." *State v. Scruggs*, 421 N.W.2d 707, 713 (Minn.1988). "A conviction based on circumstantial evidence merits stricter scrutiny. The evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988).

"When reviewing a conviction based on circumstantial evidence, this court recognizes that a jury normally is in the best position to evaluate circumstantial evidence, and that their verdict is entitled to due deference. Also, the jury determines the credibility and weight given to the testimony of individual witnesses." *State v. DeWald*, 463 N.W.2d 741, 749 (Minn. 1990) (citations and internal quotations omitted).

■ Appellant focuses his challenge to the sexual assault allegation on the sufficiency of the evidence. Appellant told the police that he and the victim had consensual sex shortly before the time of her murder. The defense theory at trial was that someone else killed Ford when she left the house after having sex with appellant. On appeal he challenges the sufficiency of the evidence against him on that theory and alternatively that even if he killed Ford, the evidence is not sufficient to show he did so during a sexual assault.

The state's trial theory was that appellant killed Ford and then had sex with her corpse. In *State v. Nielsen*, this court examined a conviction for first-degree murder committed during a sexual assault. 467 N.W.2d 615 (Minn.1991). The defendant in *Nielsen* contended he had sex with his victim's corpse thirty minutes after he murdered her, and therefore could not be

guilty of killing *during* a sexual assault. *See id.* at 617–18. We looked to whether the murder and assault were a "continuous transaction" to decide whether the conviction should be upheld. *See id.* at 618. The *Nielsen* court's recitation of events is somewhat similar to the evidence in this record:

> The defendant correctly points out the absence of scientific evidence that the sexual assault took place while the victim was alive: the autopsy did not reveal whether penetration occurred before or after [the victim's] death. Nevertheless, there was a great deal of evidence from which the jury could conclude that death occurred during or as the result of a sexual assault. Many of the victim's wounds, the disarray of her clothing, and the way in which the clothing had been torn from her upper body were suggestive of, or at least consistent with, a sexually motivated assault. * * * Even if the rape occurred after death, the jury could have believed that the assault was sexually motivated and that the criminal sexual conduct and the homicide were one continuous transaction, making the crime first degree felony murder.

*See id.*

Appellant's argument does not fit the timeline of events elicited at trial. Chambers and Beard testified they saw Ford go out around 1:00 a.m., but Chambers testified he later interrupted appellant and Ford in her bedroom at approximately 2:00 a.m. No one testified to seeing Ford leave the apartment after 2:00. Appellant's unknown killer theory lacks a basis in the record.

Ford's comforter contained blood consistent with her DNA and the blood was diluted by urine. Urine is commonly released during strangulation. There were bloodstains on Rochelle Banks' bed in the back bedroom that suggested to police that someone moved the body to that bed. This indicated that Ford was killed in her (and appellant's) apartment. Blood consistent with the victim was found in the kitchen, along the wall, and on an outside screen door. The victim's blood (or a mixture of the victim's and appellant's blood) was found on appellant's shirt, ring and sock worn at the time of arrest.

Semen consistent with appellant's DNA was recovered from the victim. The coroner testified that the elevated acid phosphate levels found in the victim's vagina indicated that the semen was deposited close to the time of death. Semen deposited in the victim near the time of death may be consistent with appellant's theory of consensual sex, assuming the murder occurred shortly thereafter and that the murder was motivated by impulses not related to the sexual assault. However, the physical evidence strongly suggests that Ford died while she was still naked on the comforter. The comforter had blood, urine and semen on it. Ford's clothing did not contain urine, and the coroner testified that the semen likely dripped from the vagina to the rectum. There was no testimony that semen dripped anywhere but to the rectum, consistent with a horizontal post-coital posture.

When Ford was found, her clothing was in disarray and she appeared to have been re-dressed after death. She had bruising in and around her mouth, eyes, face and shoulders. She had traumatic bruising of her neck and blunt force trauma injuries to her face that produced heavy bleeding from her nose.

There were small cuts and bruises on Ford's hands and arms. The coroner interpreted these as defensive wounds consistent with his conclusion that Ford died from manual strangulation. Finally, the coroner testified that he believed Ford was sexually assaulted at the time of death.

Appellant, on at least one occasion, threatened the victim with a knife. At least two witnesses testified they heard appellant in the past threaten to kill Ford. Appellant stated to a co-worker on the morning of the murder that he had "killed

the bitch," although he did not refer specifically to Ford. Police found appellant's machete under the victim's bed. Chambers testified he saw appellant with the victim on her bed during the time period surrounding her murder. No one saw Ford leave the house after this encounter. Lastly, appellant had between twenty minutes to one hour alone in the house to dispose of Ford's body.

When evaluating an insufficient evidence claim, we examine the evidence by viewing it in the light most favorable to the guilty verdict, and will assume that the jury disbelieved any testimony in conflict with the result it reached. *See State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978). After a thorough review of the record, we find the evidence to be overwhelming that appellant killed Ford and sufficient to prove that he killed her during a sexual assault. The evidence is therefore sufficient to affirm appellant's conviction for first-degree murder committed during a sexual assault.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. I believe that the district court abused its discretion when it refused to admit evidence concerning the victim's alleged practice of trading sex for money to get drugs. A key element of this case is the question of whether Ford consented to having sex with Morris. Morris claims that Ford agreed to have sex with him in exchange for money to buy crack cocaine. The state offered evidence that Ford disliked, feared, and was not attracted to Morris and that she would not have voluntarily had sex with him. Morris wanted to offer the evidence of Ford's practice of exchanging sex for drug money as an explanation of why she would have engaged in consensual sexual intercourse with him, a man she allegedly disliked, feared, and was not attracted to. Although not specifically stated, this court seems to rely on Minnesota's rape shield law, Minn.Stat. § 609.347, subd. 3 (1998),

and Minn. R. Evid. 412 to hold that the trial court did not abuse its discretion when it excluded evidence of Ford's sex-for-drugs transactions. Minnesota's rape shield law does not, however, prohibit all evidence of the victim's previous sexual conduct. We held in *State v. Friend,* 493 N.W.2d 540, 545 (Minn.1992) that "[i]n certain cases the due process clause, the right to confront accusers, or the right to present evidence will require admission of evidence otherwise excluded by the rape shield law." (citing *State v. Benedict,* 397 N.W.2d 337, 341 (Minn.1986)).

Moreover, a criminal defendant must be "afforded a meaningful opportunity to present a complete defense." *State v. Richards,* 495 N.W.2d 187, 191 (Minn. 1992). That includes the right to present relevant evidence, except when the "probative value [of that evidence] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." Minn. R. Evid. 403, 402. Evidence of a victim's past sexual conduct is generally not admissible unless its probative value is not substantially outweighed by its inflammatory or prejudicial nature, the victim's consent is an issue in the case, and the evidence tends to establish a "common scheme * * * of similar sexual conduct under circumstances similar to the case at issue * * *." Minn. R. Evid. 412.

In excluding evidence of Ford's alleged practice of trading sex for drug money, the district court deprived Morris of his right to due process and the right to present a defense. In this case, Ford's consent was clearly at issue. The jury heard testimony from Lillian Beard, one of Ford's neighbors, that she witnessed Ford purchase crack cocaine for Morris two hours before her murder. The jury also heard, through another witness, Morris' claim that Ford engaged in consensual sex with him in order to receive cocaine. Without the excluded evidence of Ford's practice of trading sex for drug money, the value of the admitted evidence is limited and results in

Morris being deprived of a "meaningful opportunity to present a complete defense."

Further, evidence of Ford's alleged practice of trading sex for money for drugs is not barred by the rape shield law. The excluded testimony is relevant and material and when limited to that specific evidence, its probative value would not be substantially outweighed by its possible inflammatory or prejudicial nature. Therefore, its exclusion was an abuse of discretion.

PAUL H. ANDERSON, J.

I join in the dissent of Justice PAGE.

STRINGER, J.

I join in the dissent of Justice PAGE.