*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1127**

State of Minnesota,
Respondent,

vs.

Dario Jothzan Abla-Salmeron,
Appellant.

**Filed May 4, 2015
Affirmed
Kirk, Judge**

Ramsey County District Court
File No. 62-CR-13-3514

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Robert D. Sicoli, Elizabeth R. Duel, Sicoli & Garry, P.L.L.C., Minneapolis, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Ross, Judge; and Kirk, Judge.

UNPUBLISHED OPINION

**KIRK**, Judge

Appellant Dario Jothzan Abla-Salmeron challenges his criminal-sexual-conduct convictions, arguing that the district court erred by admitting (1) testimony from the

victim regarding her belief that appellant was in a gang and (2) expert testimony regarding rape-victim behaviors and common rape myths.  We affirm.

**FACTS**

On May 18, 2013, J.B. went out for dinner, drinks, and dancing before briefly stopping at a friend's house.  She left the friend's house around 2:15 a.m. on May 19.  As she was walking the five blocks to her house, J.B. heard someone behind her say "guera." J.B. interpreted the term to mean "American white girl," and thought that the speaker might be someone she knew.  J.B. turned around and saw appellant, whom she did not know.  According to J.B., she turned to keep walking, but appellant pushed her down to the ground, held her down, took off her pants, and sexually assaulted her both vaginally and anally.  After about ten minutes, two people walked around the corner and appellant started to run away.

R.C. testified that he was walking with a friend when he heard a woman screaming and a "commotion."  R.C. saw appellant and J.B. "on the curb" and noticed that J.B. was not wearing pants.  Appellant walked away, and R.C. asked J.B. if she was all right. After J.B. responded that appellant had raped her, R.C. ran after appellant, telling him to come back because J.B. said he had raped her.  According to R.C., appellant responded, "Yeah.  Go ahead.  You use her next.  Your turn next."  R.C. then punched appellant, and the two fought.  During the fight, R.C. called 911.

Appellant's girlfriend then pulled up in an SUV, picked up appellant, and started to drive away.  Responding police officers saw the SUV disregard a stop sign and drive away from the scene "at a fast rate of speed."  They conducted a traffic stop of the SUV

2

about two blocks away from the fight and identified appellant and his girlfriend. One police officer noticed that appellant had abrasions to his face, unzipped pants, and smelled of alcohol. Sperm cells collected from J.B. during a sexual-assault exam later matched appellant.

In contrast to J.B.'s testimony, appellant testified that J.B. approached him as he was walking home, acted affectionately toward him, and offered to have sex with him on the ground. Appellant stated that they had consensual sex, both vaginally and anally. After they finished, appellant walked away. As he did so, two men approached him and demanded appellant's money. He alleged that R.C. told him, "If you don't give money, I'm going to accuse you that you were raping her." Appellant believed that he had been set up for a robbery.

Respondent State of Minnesota charged appellant with one count of first-degree criminal sexual conduct and one count of third-degree criminal sexual conduct. The jury found appellant guilty of both charges. This appeal follows.

**D E C I S I O N**

I. **The district court did not abuse its discretion by allowing J.B.'s testimony that she believed appellant was in a gang.**

During her direct testimony, J.B. explained that she initially hesitated to talk to the responding police officers because she was scared that appellant was in a gang. She also hesitated to go to the hospital and refused to identify the person who assaulted her at the scene for the same reason. J.B. told the police officers why she was scared, but admitted that she had no knowledge of appellant's gang membership.

3

On cross-examination, J.B. repeated her admission that she had no evidence appellant was in a gang. The defense attorney then asked J.B. about her ongoing fear:

> DEFENSE ATTORNEY: [H]as anybody given you a reason to be afraid?
> J.B.: Afraid of what?
> DEFENSE ATTORNEY: I don't know. You keep mentioning that you're afraid, that you're scared, and that you're scared today still.
> J.B.: That's because I believe that he is in a gang. I believe that. I don't have any information, but the . . . West Side has many Latino, Mexican gangs.
> DEFENSE ATTORNEY: So you still believe that my client is in a gang?
> J.B.: I don't have information that says that he is, but that's what I believe. Yes.
> DEFENSE ATTORNEY: So no information. That's just what you believe?
> J.B.: Right.
> DEFENSE ATTORNEY: Okay. And that's enough to make you scared?
> J.B.: Yes.
> . . . .
> DEFENSE ATTORNEY: Has anybody affiliated with my client tried to contact you?
> J.B.: No.
> . . . .
> DEFENSE ATTORNEY: Have there been any threats made to you from anybody that has any connection to [appellant]?
> J.B.: No.

Following this testimony, the prosecutor asked J.B. why she had recently moved to a new house. J.B. explained that her car had been broken into and that "somebody had put blood on [her] door." But J.B. agreed with appellant's attorney that she had no reason to suspect appellant or anyone connected to the case of involvement in these incidents.

Appellant argues that the district court erred by allowing J.B. to testify regarding her belief that appellant was in a gang. "Evidentiary rulings rest within the sound

4

discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003). On appeal, appellant bears the burden to show both that the district court abused its discretion and that he suffered prejudice. *See id.* The erroneous admission of evidence does not require reversal unless "the error substantially influence[d] the jury's decision." *State v. Nunn*, 561 N.W.2d 902, 907 (Minn. 1997).

Appellant first suggests that J.B.'s testimony about appellant's gang membership was irrelevant because gang membership is not an element of the charged offenses. Appellant is correct that gang membership is not an element of criminal sexual conduct. *See* Minn. Stat. §§ 609.342, subd. 1, .344, subd. 1 (2012). But "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Relevant evidence is therefore not limited to the elements of charged offenses. Appellant argued at trial that J.B. consented to vaginal and anal intercourse. J.B.'s initial reluctance to talk to police officers, go to the hospital, and identify appellant could be interpreted as evidence of consent because these facts could suggest that J.B. thought she had no reason to seek medical treatment or police intervention. As a result, J.B.'s explanation that her actions were based on fear that appellant was in a gang was relevant to a determination of her consent. *See* Minn. R. Evid. 401; *State v. Grayson*, 546 N.W.2d 731, 736-37 (Minn. 1996) (concluding that testimony regarding the defendant's view of white women was relevant to an evaluation of his version of events).

Appellant also suggests that J.B.'s testimony was irrelevant because it violated his First Amendment rights. "[T]he First Amendment protects an individual's right to join groups and associate with others holding similar beliefs." *Dawson v. Delaware*, 503 U.S. 159, 163, 112 S. Ct. 1093, 1096 (1992). But "there is no per se barrier to the admission of evidence concerning one's beliefs and associations where the evidence is relevant." *Grayson*, 546 N.W.2d at 738. Unlike in *Grayson*, where the supreme court concluded that cross-examination regarding the views of Malcolm X was irrelevant and a constitutional error, appellant was not questioned about his beliefs or associations and the jury was not invited to attribute certain beliefs to appellant. *See id.* To the contrary, appellant was not accused of gang membership and J.B. was clear that she had no evidence to corroborate her fear of gang membership. J.B.'s relevant testimony did not violate appellant's First Amendment rights.

Appellant next argues that the challenged testimony was "unduly prejudicial." Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. "[G]ratuitous testimony about a defendant's gang membership or bad character may be unduly prejudicial." *State v. Jackson*, 726 N.W.2d 454, 463 (Minn. 2007). Appellant again cites *Grayson*, in which the supreme court concluded that the danger of unfair prejudice "far outweighed" the evidence's probative value when the prosecutor made no attempt to connect testimony about Malcolm X's views to any issue in the case. 546 N.W.2d at 737. But unlike in *Grayson*, J.B.'s fear of appellant's gang membership was referenced extensively by both sides and was connected to J.B.'s consent and credibility. The

defense attorney cross-examined J.B. and others about the credibility of J.B.'s fear, and argued in closing that J.B. was not a credible witness because there was no record evidence of gang membership.

Appellant suggests that the most problematic evidence concerned J.B.'s statement that she moved because her car had been broken into and "somebody had put blood on [her] door." We are troubled that the state introduced this evidence on redirect without providing notice to the defense. But these incidents, which occurred months after the alleged criminal sexual conduct, were unrelated to the charges or the issues at trial. In addition, J.B. agreed with appellant's attorney that she had no reason to suspect appellant or anyone connected to the case of involvement in these incidents. And appellant's attorney assured the district court that he was not requesting a mistrial or any curative instructions regarding this testimony. Given the other evidence of appellant's guilt, including testimony from both J.B. and R.C., we cannot conclude that J.B.'s testimony "substantially influence[d] the jury's decision." *See Nunn*, 561 N.W.2d at 907.

We conclude that any prejudice created by J.B.'s testimony did not substantially outweigh the probative value of the evidence. *See* Minn. R. Evid. 403. J.B. repeatedly stated that she had no actual evidence of appellant's gang membership and that she did not suspect appellant of involvement in the incidents at her home. Because J.B.'s testimony was relevant to the issue of her consent and because she admitted that her fear was based solely on a belief rather than actual evidence of gang membership, appellant has not met his burden to show that he suffered prejudice. *See Amos*, 658 N.W.2d at 203.

7

**II.** **The district court did not abuse its discretion by admitting expert testimony regarding rape-victim behaviors and common rape myths.**

Appellant argues that the district court erred by admitting expert testimony regarding rape-victim behaviors and common rape myths. "Rulings concerning the admission of expert testimony generally rest within the sound discretion of the district court and will not be reversed absent a clear abuse of discretion." *State v. Mosley*, 853 N.W.2d 789, 798-99 (Minn. 2014). The erroneous admission of expert testimony requires reversal "only when the error substantially influence[d] the jury's decision." *State v. Blanche*, 696 N.W.2d 351, 374 (Minn. 2005) (quotation omitted).

Minn. R. Evid. 702 permits qualified experts to testify regarding information that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Under rule 702, expert testimony regarding nonscientific information "is admissible if: (1) the witness is qualified as an expert; (2) the expert's opinion has foundational reliability; [and] (3) the expert testimony is helpful to the jury." *State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011). Here, appellant only challenges the helpfulness of the expert's testimony.

Because typical rape-victim behaviors "may lie outside the common understanding of an average juror," expert testimony on these behaviors may be helpful to the jury. *Id.* at 293. In *Obeta*, the supreme court limited its analysis to the admissibility of expert testimony regarding the specific rape-victim behaviors of "delayed reporting, lack of physical injuries, and submissive conduct during the alleged assault."

8

*Id.* at 288. As a result, appellant argues that expert testimony can only be introduced in sexual assault cases when these behaviors are present.

Even if appellant is correct, the record shows that these three behaviors were present here. J.B. testified that she spoke to the responding police officers about ten minutes after the alleged assault. But J.B. also stated that she did not immediately approach the officers, who were looking for her, because she was scared. J.B.'s delay and reluctance to approach the officers contradicts the first common rape myth that victims will immediately report the attack. *See id.* at 293. J.B. also testified that she sustained scratches and bruising. But the sexual-assault examiner testified that there was no evidence of tearing or injury to J.B.'s vagina. This testimony contradicts the second rape myth that victims "suffer severe physical injuries—including vaginal injuries." *See id.* Finally, J.B. testified that she did not resist as appellant took off her pants and that she unsuccessfully tried to crawl away during the assault. J.B. "tried" to fight back, but could not move due to appellant's weight. The sexual-assault examiner also noted that there was no evidence of defensive maneuvers or injuries. These statements contradict the third rape myth in *Obeta* that "victims will forcefully resist their assailant." *See id.* Because the three rape-victim behaviors present in *Obeta* were also present here, the district court did not abuse its discretion in admitting the expert testimony.

We further note that the expert here only provided testimony regarding the delayed-reporting behavior. The expert explained that "[t]here is really a wide range of behaviors from victims" of sexual assault and that "there are a high number of victims who, in fact, don't report sexual assault" because they are ashamed, are afraid others will

9

not believe them, or are afraid of retaliation. This testimony was particularly relevant in light of J.B.'s testimony that she thought the attack was her fault and that she was reluctant to report the attack to the responding police officers. Consistent with *Obeta*, the expert did not opine that J.B. was credible or that a sexual assault had occurred. *See id.* at 294. In fact, the expert testified that she had no knowledge of the facts of the case. The expert's testimony therefore met all of the *Obeta* requirements for admission.

Because the expert's testimony regarding typical rape-victim behaviors and rape myths was relevant and helpful to the jury, the district court did not abuse its discretion in admitting the expert testimony.

**Affirmed.**